No. 2--05--1044 filed: 9/1/06

_____

_____

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

_____

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Winnebago County. |
| Petitioner-Appellee, | ) ) | |
| v. | ) ) | No. 05--MR--174 |
| TARA, | ) ) | |
| Respondent, | ) ) | |
| (Anthony Beall, Owner of Tara, Respondent-Appellant). | ) ) ) | Honorable Gary V. Pumilia, Judge, Presiding. |

_____

_____

JUSTICE BOWMAN delivered the opinion of the court:

On May 6, 2005, the State filed a vicious-dog petition under section 2.19b of the Animal Control Act (Act) (510 ILCS 5/2.19b (West 2004)). The petition alleged that Tara, a rottweiler, attacked Melissa Blecker without justification. Following a bench trial, the Winnebago County circuit court found Tara to be a vicious dog. Tara's owner, Anthony Beall, appeals the order, arguing that the State failed to prove by clear and convincing evidence that (1) the puncture wound inflicted by Tara was a "serious physical injury," and (2) Tara's actions were without justification. We affirm.

I. BACKGROUND

A bench trial commenced on July 21, 2005, at which the following evidence was adduced. On August 20, 2004, at approximately 7:30 p.m., Blecker was taking her usual evening walk down a neighborhood street. First, Blecker passed Alexandria Reynolds, Beall's daughter, who was riding a bike in the opposite direction. Next, Blecker approached Tara, who was being walked on a leash by Sharon King, Beall's mother-in-law, and Kaitlyn Beall, Beall's eight-year-old daughter. As they passed each other on the same side of the street, Tara bit Blecker. This was the first time that Blecker had ever encountered King, Kaitlyn, or Tara.

The remaining facts are disputed, and we begin with Blecker's account of the incident. Blecker was walking for exercise, which she described as a "purposeful walk," such as walking down a hallway at work, but she was not power walking. When Blecker was about 15 to 20 feet away from King and Kaitlyn, Tara was barking loudly and lunging toward her. Blecker evidently looked worried, because King told her not to worry and that Tara would "lick her to death." King was gripping the leash to prevent Tara from running away. Because of King's assurances, Blecker did not cross to the other side of the street, but instead made an arc of four to five feet around them. When doing so, Blecker stated, "Ooh, that's a big dog." Blecker never made eye contact with Tara or moved toward King or Kaitlyn. Tara then leapt out and bit Blecker's left arm in the triceps.

After Tara bit down, she did not let go, and King had to grab Tara by the collar to pull her away. It felt like a bear trap on Blecker's arm. On a scale of 1 to 10, Blecker felt pain at level 10. Blecker was stunned, shocked, and having difficulty breathing. She then knelt down in Greg Lemek's yard, and King tried to look at Blecker's arm. When King asked Blecker what she wanted her to do, Tara was still barking and King was holding her back by

the collar. At this time, Greg Lemek and his daughter Brittani came over to assist Blecker, who was taken to the emergency room.

The sweatshirt that Blecker was wearing that night, which had a hole and two bloodstains, was shown to the court. In addition, Blecker identified two photos taken of the wound after she returned from the emergency room, and two photos taken a few days later. There was a hard lump under her skin at the wound. When asked how deep the wound was, Blecker stated that it went all the way to the bone. Defense counsel objected on the basis that Blecker was not qualified to offer medical testimony, but the trial court overruled the objection. The emergency room doctor told Blecker that Tara's tooth had gone through the skin and muscle to the bone. As a result, the doctor irrigated Blecker's arm by using a water pistol to drive a stream of saline solution into the wound. When Blecker's arm filled up with water, the pain was excruciating. The procedure was performed a few times using Novocain, but then stopped due to the pain. Blecker received a tetanus shot, an antibiotic to prevent infection, and a Vicodin prescription. She did not receive stitches, because the wound needed to "ooze." Globs of fat came out of the wound.

Blecker showed the court the scar, which measured one-quarter to one-half an inch wide. Although Blecker could perform normal daily activities, she still experienced "burning pain" more than once a month. In response to the burning, Blecker saw her primary care physician twice and a neurologist. Her neurologist explained that the pain resulted from the knot of scar tissue pressing on a nerve. Blecker also received an MRI. To eliminate the scar, the scar tissue would need to be removed from under the skin. Laser treatments would be required to make the scar less pronounced. The laser treatment was a form of plastic surgery, which Blecker could not afford.

Brittani Lemek, age 13, testified that she was outside her house and saw the incident on August 20. According to Brittani, Blecker was walking normally down the street, not power walking. As Blecker approached Tara, Tara was "lunging out" or "leaning forward" at Blecker. Blecker made no movements toward King, Kaitlyn, or Tara, and she walked into another person's yard in an attempt to veer away from Tara. Brittani thought that Blecker was a few feet from Tara when the dog jumped and bit Blecker's arm.

King's version of events differed from the testimony of Blecker and Brittani. According to King, Blecker was "power walking," with her arms bent at the elbows, her fists clenched, and her hands moving up to the height of her face. When Blecker was about 20 feet away, she looked at King, who said, "Don't worry about the dog. She would probably lick you to death." The leash holding Tara, which measured 46 inches, was wrapped around King's wrist, reducing the length to about 38½ inches. Blecker never tried to steer clear of Tara, and Blecker was only six or seven inches away when she passed them. King could feel the movement of Blecker's arm as she passed by, but Tara did not growl or lurch at Blecker. Then, in a "very loud" voice, Blecker said, "That really is a big dog." Tara turned quickly and leapt between them, "grabbing" Blecker's arm with one of her fangs. After that, Tara sat down. King never saw Tara's mouth clamp down on Blecker's arm, and she did not pull Tara off of Blecker. At no point was Tara barking or growling. When King looked at Blecker's arm, she saw a red mark smaller than the end of a pen. The wound was not bleeding. King estimated that Tara weighed between 80 and 100 pounds.

Alexandria, who was riding her bike, and Kaitlyn both testified that Blecker was power walking as she approached them. According to Kaitlyn, Tara was not barking or growling. When Blecker passed them, she almost brushed against King's shoulder,

although Kaitlyn described the distance as 2½ to 3 feet away. In a louder-than-normal voice, Blecker said, "Big dog, big dog." King told Blecker that Tara would probably lick her to death. Tara "lunged" at Blecker and then sat down.

Defense expert Dr. Susan Krebsbach, a veterinarian specializing in animal behavior, testified as follows. Dr. Krebsbach performed a three-hour in-home evaluation of Tara eight months after the incident (April 21, 2005). Dr. Krebsbach was introduced to Tara by the Beall family, and she also considered information given to her by the Bealls. In Dr. Krebsbach's opinion, Tara was "extremely well-behaved" and "very super-social"; she exhibited no aggression or aggressive tendencies.

Defense counsel then questioned Dr. Krebsbach about the following hypothetical. Blecker, a stranger, is walking fast and raising her arms over her head (power walking) when she approaches King, Kaitlyn, and Tara. She passes within a foot of them and loudly states, "That is a big dog." Tara lunges at Blecker and nips her upper-left arm. Dr. Krebsbach testified that, in her opinion, Tara would interpret Blecker as a threat and her response would be justified and appropriate in that context. Dr. Krebsbach explained that the two most important factors in the hypothetical were Blecker being a stranger and Blecker passing very close to Tara and "her people." Dr. Kresbach further explained that the nature of the injury supported her opinion, in that Tara took only one "warning bite," which was not very severe. When the threat retreated, Tara retreated. If Tara had bitten multiple times or not let go, that would have constituted more aggressive behavior. If Tara had had to be pulled away because she would not let go, the injury would have been worse because of "scraping" and "drag marks" on Blecker's arm.

On cross-examination, the State posed a different hypothetical. Instead of power walking, Blecker is walking normally, swinging her arms at her sides. She arcs around Tara at a three- to five-foot distance, and comments about the size of the dog in a normal voice. Dr. Kresbach explained that a dog would not be justified in biting a stranger because of a perceived threat if the stranger approached the dog at a distance of three to five feet. In Dr. Kresbach's opinion, Tara would not "lurch out" and bite Blecker in this scenario.

Because it is difficult to grasp everything in one consultation, Dr. Krebsbach admitted that she might add to an initial diagnosis the more she got to know an animal. She also admitted that when she tested and evaluated Tara for aggressive responses, Tara was already familiar with Dr. Krebsbach, having worked with her for several hours.

Several witnesses testified regarding Tara's temperament. Vicki Buckholz, a certified dog-trainer and a kennel owner, evaluated Tara shortly after the biting incident. After observing Tara for approximately 10 days in her kennel, Buckholz opined that Tara had a nice, "even-keel" temperament. She observed no aggressive traits in Tara. Pest exterminator Kris Mei testified that she had been in the Beall home numerous times when only Tara was present. Mei described Tara as a "big happy dog" who had never growled at her, lurched at her, or bitten her. Beall's neighbor, Candy Bunk, testified that she had been around Tara "countless" times and that she allowed her six-year-old to play at the Beall house. Bunk never observed any aggressive behavior in Tara.

The trial court found Tara to be a vicious dog, stating the following. Blecker did not torment, abuse, assault, or physically threaten Tara, but was engaged in "common, ordinary, everyday walking along the streets." Although Tara "probably felt there was a threat" and "thought it was protecting" given Blecker's "unusual" "gait," Tara was not

justified in biting or attacking Blecker. The puncture wound, especially one as deep as Blecker's, was "serious by definition." Also, there was "minor" evidence of "other teeth marks" and "a drag mark" in the photos. The court was not sure whether the "long kind of abrasion scratch mark" was caused by "somebody pulling the arm or pulling the dog off." The wound qualified as a "serious physical injury," resulting in a "discernable scar," which would require plastic surgery to remove. Blecker's ongoing pain, caused by the change in the interior of her arm, was consistent with a serious injury. While the court believed "100% the testimony that Tara is a great dog," it had no choice but to find Tara "vicious" as defined under the statute.

Beall moved to reconsider the ruling, and the trial court denied this motion. Beall's timely appeal followed.

## II. ANALYSIS

Beall presents essentially two arguments on appeal: first, that Blecker's wound was not a "serious physical injury," and second, that Tara's conduct was justified. We will not reverse the trial court's vicious-dog determination unless it was against the manifest weight of the evidence. Logan County Animal Control Warden v. Danley, 211 Ill. App. 3d 198, 203-04 (1991). A judgment is against the manifest weight of the evidence only when an opposite conclusion is apparent or when findings appear to be unreasonable, arbitrary, or not based on the evidence. Bazydlo v. Volant, 164 Ill. 2d 207, 215 (1995). This is because the trial judge, as the trier of fact, is in a superior position to a reviewing court to observe witnesses while testifying, to assess their credibility, and to determine the weight their testimony should receive. Bazydlo, 164 Ill. 2d at 214-15.

### A. Serious Physical Injury

We begin by setting forth the relevant statutes. Under section 2.19b, a "[v]icious dog means a dog that, without justification, attacks a person and causes serious physical injury or death." 510 ILCS 5/2.19b (West 2004). Section 2.19 defines "serious physical injury" as "a physical injury that creates a substantial risk of death or that causes death, serious or protracted disfigurement, protracted impairment of health, impairment of the function of any bodily organ, or plastic surgery." 510 ILCS 5/2.19a (West 2004). Section 15(a) states that "[t]he petitioner must prove the dog is a vicious dog by clear and convincing evidence." 510 ILCS 5/15(a) (West 2004).

Beall makes several arguments why Blecker's puncture wound should not qualify as a "serious physical injury." First, Beall asserts that the statute was never meant to include the type of injury that Blecker suffered, which Beall describes as a "pea-sized pink dot." According to Beall, the legislative history reveals an intent to cover more serious injuries. The State responds that section 2.19a's definition of "serious physical injury" is clear and unambiguous; thus, it is improper to consider the legislative history. The State argues that even if we were to consider the legislative history, it does not show an intent to exclude Blecker's wound, as Beall claims.

We review questions of statutory interpretation de novo. Elementary School District 159 v. Schiller, 221 Ill. 2d 130, 144 (2006). The fundamental rule of statutory interpretation is to ascertain and effectuate the intent of the legislature. Elementary School District 159, 221 Ill. 2d at 144. The plain language of a statute remains the best indication of the legislature's intent. Elementary School District 159, 221 Ill. 2d at 144. When the statutory language is clear, it must be given effect without resort to other aids of interpretation. Village of Chatham v. County of Sangamon, 216 Ill. 2d 402, 429 (2005).

In urging this court to consider the legislative history, Beall does not explain how the statutory language is ambiguous. On the contrary, the statute contains a definition of "serious physical injury." See Garza v. Navistar International Transportation Corp., 172 Ill. 2d 373, 379 (1996) (it is well established that when a statute defines the very terms it uses, those terms must be construed according to the definitions contained in the act). As stated, "serious physical injury" is defined as "a physical injury that creates a substantial risk of *** protracted impairment of health, impairment of the function of any bodily organ, or plastic surgery." 510 ILCS 5/2.19a (West 2004). Because this language is clear and unambiguous, we do not resort to other aids of interpretation, but rely only on the plain language of the statute.

Second, Beall asserts that the language in section 2.19a does not mention anything about being "bitten," in contrast to section 2.12, which defines "has been bitten." Under section 2.12, " '[h]as been bitten' means has been seized with the teeth or jaws so that the person or animal seized has been nipped, gripped, wounded, or pierced, and further includes contact of saliva with any break or abrasion of the skin." 510 ILCS 5/2.12 (West 2004). In Beall's view, the fact that the legislature defined a dog bite in section 2.12, but failed to include any such language in section 2.19a's definition of "serious physical injury," evinces an intent not to include a typical dog bite in the category of a "serious physical injury." Otherwise, Beall argues, every dog that bites a person and pierces the skin would be classified as a "vicious dog." However, as the State points out, the statutory definition of "has been bitten" gives meaning to the phrase as it is used elsewhere in the Act (see 510 ILCS 5/13 (West 2004)). Also, rather than containing a list of specific injuries, such as being bitten or piercing the skin, section 2.19a describes injuries resulting from a dog attack

in terms of their severity. Thus, whether an injury qualifies as a "serious physical injury" depends on its severity. Accordingly, the failure of the legislature to specifically include a dog bite in the definition of a "serious physical injury" does not indicate an intent to exclude a "serious physical injury" that *results from a dog bite. See Village of Chatham, 216 Ill. 2d at 429 it is never proper for a court to depart from the plain language by reading into the statute exceptions, limitations, or conditions that conflict with the clearly expressed legislative intent .*

Third, Beall asserts that the State did not meet its burden of proving, by clear and convincing evidence, that Blecker suffered a "serious physical injury." See Baker v. Jewel Food Stores, Inc., 355 Ill. App. 3d 62, 69-70 (2005), quoting Bazydlo, 164 Ill. 2d at 213 ("Clear and convincing evidence is 'the quantum of proof that leaves no reasonable doubt in the mind of the fact finder as to the truth of the proposition in question,' i.e., more than a preponderance while not quite approaching the degree of proof necessary for a criminal conviction"). Specifically, Beall asserts that Blecker's "self-serving lay testimony," without additional medical expert testimony, was insufficient to prove a "serious physical injury" by a clear and convincing standard. Beall also asserts that, because Blecker was not a medical expert, she was not qualified to testify about medical diagnoses, conditions, and procedures. For the following reasons, we reject these arguments and hold that the State proved that the injury caused impairment of the function of a bodily organ (Blecker's skin), protracted impairment of her health, and the need for plastic surgery.

As Beall admits, Blecker properly testified regarding the general nature of her injury, the level of her pain and discomfort, and the resulting scar and the hard lump beneath her skin. See Wiacek v. Hospital Service Corp, 15 Ill. App. 3d 698, 701 (1973) (it is customary for plaintiffs in injury cases to testify as to the injuries they received). Moreover, given

Blecker's "discernable scar," the photographs, and the sweatshirt she was wearing on the night of the incident, medical testimony was not required in this case. See Geers v. Brichta, 248 Ill. App. 3d 398, 406-07 (1993) (in a personal injury action, there is no requirement that a plaintiff produce medical testimony concerning the nature and consequences of injuries she sustained); see also Turner v. City of Chicago, 95 Ill. App. 2d 38, 39 (1968) (there is no requirement that a plaintiff produce medical testimony where the plaintiff clearly testifies to her injuries and the medical treatment she received). Thus, Beall's blanket assertion that Blecker's testimony was improper fails.

As the trial court noted, the evidence presented at trial showed that the puncture wound inflicted by Tara was deep. Blecker testified that the wound went all the way to the bone, and that when her arm was irrigated, she could actually "feel" her arm fill up with water, which was excruciatingly painful. Moreover, the emergency room doctor informed Blecker that the wound went through the skin and muscle, down to the bone. Because Beall failed to object to hearsay statements from the emergency room doctor, this issue is waived on appeal and the evidence could be considered by the trial court and given its natural probative effect. See People v. Ramsey, 205 Ill. 2d 287, 293 (2002) (the failure to object to hearsay not only waives the issue on appeal, but allows the evidence to be considered by the trier of fact and given its natural probative effect). Blecker further testified that she did not receive stitches because the wound needed to ooze, and that globs of fat came out of the wound. The doctor prescribed antibiotics and gave her a tetanus shot to stave off infection. As the State argued at trial, skin is an organ. Thus, the court could have found that the puncture wound impaired the skin's function in protecting the body's internal structures from injury and infection.

Second, a hard lump of scar tissue remained beneath Blecker's skin 11 months after the incident. We note that the trial court was in a superior position to assess the severity of the wound by viewing Blecker's scar, which measured one-quarter to one-half an inch wide. Blecker's neurologist advised her that the burning pain she experienced more than once a month was caused by the underlying knot of scar tissue that continued to press on her nerve. (Again, Blecker's testimony could be considered by the trial court because Beall failed to make a hearsay objection.) Based on the continued burning sensations, the trial court could have found that the injury created a substantial risk of protracted impairment of health. As the court stated, Blecker's "ongoing pain," caused by the change in the interior of her arm, was consistent with a serious injury.

Third, Blecker testified that plastic surgery was required to remove the scar. Initially, the scar tissue would need to be removed from under the skin, and then laser treatment performed to make the scar less visible. Blecker testified that the laser treatment was a form of plastic surgery, which had not been performed due to the expense. "Serious physical injury" is defined as "a physical injury that creates a substantial risk of *** protracted impairment of health, impairment of the function of any bodily organ, or plastic surgery." 510 ILCS 5/2.19a (West 2004). Because the scar could not be removed without plastic surgery, the court could have found that Blecker's wound constituted a "serious physical injury."

Furthermore, the trial court relied on photographs of Blecker's injury in determining the severity of the bite. While Beall challenges the court's interpretation of the photographs, which were taken after Blecker returned from the emergency room and a few days after the incident, we accord great deference to the trial court's factual findings. See

People v. Braggs, 209 Ill. 2d 492, 505 (2003) (the reviewing court accords great deference to the trial court's factual findings and will reverse those findings only if they are against the manifest weight of the evidence). The court, which specifically noted that it had several years of experience examining photos of injuries, found "minor" evidence of other teeth marks and a drag mark, which appeared as a "long kind of abrasion scratch mark." With respect to the long scratch mark, the court made no definitive finding, stating that it was uncertain whether it was caused by "somebody pulling the arm or pulling the dog off." Our review of the photos shows evidence of such marks. Additionally, we note that the court also viewed the sweatshirt that Blecker wore, which had a hole and two bloodstains. Based on the evidence, the trial court's factual findings were not against the manifest weight of the evidence, and the puncture wound inflicted by Tara constituted a "serious physical injury."

### B. Without Justification

Beall next argues that the trial court erred by disregarding Dr. Krebsbach's testimony when it applied a "human standard" to Tara in finding that her actions were without justification. Beall asserts that, given Blecker's version of events, Dr. Krebsbach opined that Tara would not have bitten her. According to Beall, the court should have given more weight to Dr. Krebsbach's testimony, especially when the State presented no canine expert of its own to contradict her testimony.

Section 15 provides the requirements for a vicious-dog determination. It states, in relevant part:

"(a) *** The Administrator, State's Attorney, Director or any citizen of the county in which the dog exists may file a complaint in the circuit court in the name of the People of the State of Illinois to deem a dog to be a vicious dog. Testimony of a

certified applied behaviorist, a board certified veterinary behaviorist, or another recognized expert <u>may</u> be relevant to the court's determination of whether the dog's behavior was justified. ***

A dog shall not be declared vicious if the court determines the conduct of the dog was justified because:

***

(2) the injured, threatened, or killed person was tormenting, abusing, assaulting, or physically threatening the dog or its offspring, or has in the past tormented, abused, assaulted, or physically threatened the dog or its offspring; or

(3) the dog was responding to pain or injury, or was protecting itself, its owner, custodian, or member of its household, kennel, or offspring." (Emphasis added.) 510 ILCS 5/15 (West 2004).

After finding that Blecker did nothing to torment, abuse, assault, or physically threaten Tara, the court stated that the important issue was whether Tara was protecting King and Kaitlyn. The court reasoned:

"I have no doubt as much as I can tell, not being a dog psychic, that the dog probably felt there was a threat, felt it was protecting, did react. And I suspect we have a person who [sic] with a gait that the dog deemed unusual and strange, and the dog didn't know what to make of it, the dog tried to protect the people, but if that was a person doing what the dog did, I'd tell the person you can't do that. The dog probably thought it was protecting, but it was not justified in that.

What occurred was something common, ordinary, everyday walking along the streets in paths with animals. There was no justification, there was serious physical injury."

The facts in this case were disputed. On the one hand, King testified that Blecker never tried to steer clear of Tara but was power walking and passed them less than a foot away. Kaitlyn and Alexandria similarly testified that Blecker was power walking. On the other hand, Blecker testified that she was walking normally down the street, that she made an arc of several feet around Tara, that she made no movements toward Tara as she passed, and that she was a few feet away when Tara leapt out and bit her arm. Brittani completely corroborated this testimony, and even Kaitlyn described Blecker's distance from Tara as 2½ to 3 feet at the time she was bitten. Based on all of the evidence, the trial court specifically found that Blecker was engaged in common, ordinary walking down the street. The court further found that Tara probably felt she was protecting King and Kaitlyn as Blecker passed, but that this did not justify biting Blecker. See Bazydlo, 164 Ill. 2d at 215 (where the testimony is conflicting in a bench trial, the trial court's findings will not be disturbed unless they are against the manifest weight of the evidence).

According to Dr. Krebsbach, Tara would not have been justified in biting Blecker if she were walking normally and passed at a three- to five-foot distance. While Dr. Krebsbach also opined that Tara would not "lurch out" and bite someone in this scenario, as Blecker claimed Tara did, the weight to be accorded an expert's opinion is determined by the facts supporting the expert opinion and the reasons given for it. See Wilfert v. Retirement Board of the Firemen's Annuity & Benefit Fund, 318 Ill. App. 3d 507, 514 (2000). Moreover, the trial court is free to accept or reject expert testimony in whole or in

part, and the trial court need not accept the opinion of one expert even where that expert's testimony is not directly countered by the expert testimony of another. Villareal v. Peebles, 299 Ill. App. 3d 556, 562 (1998). Under the facts presented, there was sufficient evidence to support the court's finding that Tara acted without justification when she bit Blecker.

Furthermore, had the trial court accepted Beall's claim that Blecker was power walking as she passed Tara, our conclusion would not change. We recognize that, at trial, Dr. Krebsbach opined that Tara would be justified in interpreting Blecker as a threat if she were power walking and passed Tara closely. However, based on the statutory language, Tara would not have been justified in biting Blecker if Blecker were power walking or even jogging as she passed. The statute specifically sets forth the circumstances under which Tara's biting Blecker would be justified. Because Blecker never physically threatened, tormented, abused, or assaulted Tara, the only issue was whether Tara's action was justified because the dog was "protecting itself, its owner, custodian, or member of its household." 510 ILCS 5/15(a)(3) (West 2004). Regardless of Blecker's gait, there was simply no reason for Tara to "protect" King and Kaitlyn. Otherwise, a dog's conduct would be justified anytime it perceived a threat and felt the need to protect. Thus, we disagree with Beall's assertion that the trial court should have placed greater weight on Dr. Krebsbach's testimony. Although such testimony "may be relevant to the court's determination of whether the dog's behavior was justified" (emphasis added) (510 ILCS 5/15(a) (West 2004)), expert testimony may not trump the plain language of the statute. For these reasons, our decision does not hinge upon whether Blecker was power walking.

As a final matter, we find no merit in Beall's argument that the trial court incorrectly applied a "human standard" to Tara in finding that the dog's actions were not justified.

There is nothing in the court's discussion to show an improper standard being applied. Rather, as noted above, the court carefully followed the statute in finding Tara to be a vicious dog.

### III. CONCLUSION

The court's determination that Tara is a vicious dog was not against the manifest weight of the evidence.

For the foregoing reasons, the Winnebago County circuit court's judgment is affirmed.

Affirmed.

O'MALLEY and GILLERAN JOHNSON, JJ., concur.