NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2022 IL App (4th) 200255-U

NO. 4-20-0255

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
January 4, 2022
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | Macon County |
| MARK MARQUIS, | ) | No. 18CF1320 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | Erick F. Hubbard, |
| | ) | Judge Presiding. |

_____

JUSTICE HARRIS delivered the judgment of the court.
Justice Cavanagh concurred in the judgment.
Justice Steigmann dissented.

**ORDER**

¶ 1    *Held*:    (1) The evidence was insufficient to sustain one of defendant's two convictions for aggravated criminal sexual abuse.

(2) The trial court did not abuse its discretion by granting the State's motion *in limine* to exclude certain defense witness testimony.

¶ 2    Following a jury trial, defendant, Mark Marquis, was found guilty of two counts of aggravated criminal sexual abuse (720 ILCS 5/12-16(c)(1)(i) (West 2010)) and sentenced to two, concurrent four-year prison terms. He appeals, arguing (1) the State failed to prove his guilt beyond a reasonable doubt and (2) the trial court erred by excluding defense witness testimony. We affirm in part and reverse in part.

¶ 3                                    I. BACKGROUND

¶ 4        The State charged defendant—by information in September 2018 and amended information in October 2019—with five counts of predatory criminal sexual assault of a child (*id.* § 12-14.1(a)(1); 720 ILCS 5/11-1.40(a)(1) (West 2012)) and six counts of aggravated criminal sexual abuse (720 ILCS 5/12-16(c)(1)(i) (West 2010); 720 ILCS 5/11-1.60(c)(1)(i) (West 2012)). The charges were based on allegations that defendant engaged in sexual acts with two minor brothers, J.O. and C.O., between April 2005 to April 2009, August 2009 to June 2011, and July 2011 to August 2012. Specifically, the State alleged contact between J.O.'s penis and defendant's mouth, hand, and legs (counts I, II, and III), C.O.'s penis and defendant's mouth (counts IV and VI) and hand (counts VIII and X), C.O.'s mouth and defendant's penis (counts V and VII), and C.O.'s hand and defendant's penis (counts IX and XI).

¶ 5        Prior to defendant's trial, the State filed a motion *in limine*, asking the trial court to bar defendant's wife, Diane Marquis, "from testifying about her sexual relationship with *** defendant." It noted that during an "interview with authorities," Diane reported having no sexual relationship with defendant in the "three decades since [he] suffered a stroke" because he was "unable to do so." The State argued that whether defendant engaged in sexual relations with his wife was not relevant to determining whether he was guilty of sexually abusing prepubescent boys. It also asserted as follows:

> "[A]ny testimony given by [Diane] along those lines is a loosely veiled attempt to state the defendant has erectile dysfunction. [Diane] is not a medical professional and cannot testify about whether or not the defendant has a medical condition. Certainly[,] by allowing [Diane] to state she has not had sex with the defendant in three decades, the implication is that the defendant is unable to do so when there are other reasons they may not have engaged in sexual relations."

¶ 6    During a hearing on the motion, the State raised the same arguments, asserting Diane's testimony about her sexual activity with defendant would not be relevant to determining defendant's guilt or innocence, and that it would be an improper attempt at establishing that defendant suffered from a medical condition, *i.e.*, erectile dysfunction, without the presentation of medical testimony or evidence. Conversely, defendant's counsel argued the evidence was relevant to the issue of whether the alleged acts were performed for "sexual gratification or arousal of the victim or the defendant," an element of the State's case. He maintained Diane's testimony would be circumstantial evidence of whether defendant could "perform sexually." Ultimately, the trial court granted the State's motion, stating it believed "the State's position [was] correct."

¶ 7    At trial, the State presented testimony from both J.O. and C.O., as well as their mother, Alison S. Evidence showed J.O. was born in April 1998, and C.O. was born in August 2002. At the time of trial, they were ages 21 and 17, respectively.

¶ 8    Alison testified she had known defendant for over 30 years. He resided with his wife and daughter next door to her childhood home on MacArthur Road in Decatur, Illinois. From 2002 to February 2011, Alison and her children resided on the same street. Her residence was also next door to her childhood home, where her mother still lived, and, thus, one house away from defendant's residence. By all accounts, J.O. and C.O. had a close relationship with defendant and Diane. Alison viewed them like "second grandparents" to her children. J.O. and C.O. visited defendant and Diane's home often and frequently spent the night. Sometimes, defendant would also pick J.O. and C.O. up from school. Alison testified J.O. and C.O. occasionally went to defendant and Diane's house together, but more often, they went separately. When the family moved in 2011, J.O. was in seventh grade and C.O. was in second grade.

¶ 9    In March 2018, J.O. told Alison that something had happened with defendant.

Alison testified that "[a] couple of days later" she talked to C.O. and asked him "if anything had ever happened to him." Initially, C.O. denied that anything had occurred. After a couple more days, Alison had another conversation with C.O. Approximately a week later, the police were called. Alison testified it was not an easy decision to contact the police and she "ultimately left it up to the boys."

¶ 10      J.O. testified he had "[a]n amazing relationship" with defendant. They spent a lot of time together and J.O. would help defendant with yard work and filling vending machines. Defendant also bought J.O. his first go-kart. J.O. stated he was in seventh grade when he moved, and his good relationship with defendant and Diane continued until March 2018.

¶ 11      J.O. estimated that he began staying the night at defendant and Diane's house when he was six or seven years old, and that activity continued for four or five years. Defendant and Diane had separate bedrooms and when J.O. would spend the night, he usually slept in bed with defendant. J.O. recalled that when he was approximately seven, he and defendant would be unclothed and defendant "would put lotion on between his legs." J.O., who was positioned behind defendant, would then "put *** [his] penis in between [defendant's] legs and do [a] humping motion until [J.O.] had an orgasm." Defendant would also "ask [J.O.] to either make [defendant] cum or to play with [defendant]." According to J.O. "sometimes it'd be a, you do this[,] and I do that to you type of situation." When asked what that meant, J.O. testified: "Like, will you suck my d***. And if I do it, will you do it to me."

¶ 12      J.O. stated that during his interactions with defendant, he touched defendant's penis with his hand. Defendant would instruct him regarding what to do by moving his own hand in an up and down motion. J.O. testified he and defendant also performed oral sex on one another. He acknowledged that he had not previously reported contact between defendant's penis and his

- 4 -

mouth, stating he was scared and indicating that he was embarrassed. When he would touch defendant's penis or when defendant's penis was in his mouth defendant would "have an orgasm and his penis wouldn't be hard anymore."

¶ 13　　　　J.O. testified that when he was being abused by defendant, Diane was either in her room asleep or, when it happened during the day, at work. Initially, J.O. did not think what was happening with defendant was wrong. He thought what was happening "felt good" and that "it was something [he] wanted to do." He did not tell anyone about what was happening because he "enjoyed it" and "thought it was normal." J.O. described his relationship with defendant outside of the sexual activity as "awesome" and "fun."

¶ 14　　　　According to J.O., the abuse occurred "at least every other day" and for approximately four or five years. J.O. recalled moving when he was in the seventh grade and stated, "that's when it stopped happening." J.O. also testified that the abuse stopped prior to his move because he "eventually realized it was something that wasn't right[,] and it wasn't something [he] wanted to do anymore." J.O. believed he was 13 or 14 when he had that realization and stated it occurred after he walked in on his uncle having sex with a woman. He then stopped going over to defendant's house as much as he had before and no longer stayed the night.

¶ 15　　　　After realizing what had happened with defendant was wrong, J.O. did not tell anyone because he was embarrassed. However, in March 2018, he finally reported what had happened to his mother at the prompting of his girlfriend. He stated his girlfriend confided in him that she had been molested as a child and he told her about what defendant had done to him. According to J.O., his girlfriend stated, "either you tell your mom or I'm gonna tell her for you." J.O. denied that he ever spoke with C.O. about what happened with defendant.

¶ 16　　　　The State then further questioned J.O. regarding how often he was abused, and the

- 5 -

following colloquy occurred:

"Q. So we've talked about—well, do you know how often this happened, this defendant touching you?

A. Like every other day.

Q. Pardon me?

A. Pretty frequent. Every other day at least.

Q. Okay. Do you know how many times he had you touch his penis with your hand?

A. No, I do not.

Q. Do you know how many times he touched your penis with his hand?

A. No, I do not.

Q. Do you know how many times he put your penis in his mouth?

A. No, I do not.

Q. And how about, do you know how many times he put his penis in your mouth?

A. No, I do not.

Q. And do you know how many times he had you rub your penis between his legs by using lotion?

A. Not an exact number, no

Q. Do you—why is that?

A. Because it happened so much."

¶ 17       On cross-examination, J.O. testified the sexual contact with defendant stopped when he moved, not before. Further, he acknowledged previously stating to police that the "sexual

- 6 -

abuse occurred daily for two to three years." J.O. also agreed that he told the police that defendant would perform oral sex on him and "fondle [his] penis," but not that he performed oral sex on defendant. Just prior to trial, on October 16, 2019, J.O. reported contact between his mouth and defendant's penis. He remembered reporting that he was "80[%] certain" such contact occurred and agreed that he was "not sure all the way." Additionally, he acknowledged telling the police that the abuse only occurred when Diane was not home but testified that statement was incorrect.

¶ 18    J.O. also reiterated that he eventually felt what was happening with defendant was wrong. He did not remember what age he was when that occurred and initially stated he did not remember telling anyone that he had that feeling when he was 10 years old. Upon further questioning, he remembered making that statement to the police in April 2018. However, he clarified that it was some time after age 10 that he felt what was occurring was wrong. He stopped going over to defendant and Diane's house as much and the inappropriate touching stopped.

¶ 19    J.O. testified that when he went to defendant and Diane's house, C.O. was not normally present. At some point, C.O. started going over on his own; however, J.O. did not recall when exactly that was. Additionally, he never told C.O. that defendant had been touching him inappropriately. Finally, J.O. testified that he had observed defendant with an erection.

¶ 20    On redirect examination, J.O. testified that after disclosing the abuse to his mother in March 2018, he talked to the police about a week later at his aunt's house. Present at the house was his aunt, her boyfriend, J.O.'s parents, his brother, and sister. When asked how he felt about talking to the police, he stated he "didn't want to" and "didn't want to tell anybody about this" because it was embarrassing. J.O. further testified that he was "pretty confident" that contact occurred between his mouth and defendant's penis, but he could not "remember for sure if it did."

¶ 21    C.O. testified he resided in defendant's neighborhood until his family moved in

2011, when he was in fifth grade. He remembered beginning his fifth-grade year at one school and finishing at another. C.O. recalled spending time at defendant and Diane's house, stating defendant taught him how to shoot guns and that he helped defendant with yard work. C.O. testified he had a good relationship with defendant and they "did a lot together."

¶ 22 When C.O. was four or five, he began spending the night with defendant and Diane. His overnight visits continued until his family moved. When he spent the night, C.O. slept in a bed with defendant and Diane slept in her own room. During those visits, defendant "used to make [C.O.] touch [defendant] and stuff, [and] make [defendant] cum." Defendant would also touch C.O. "and do the same to [him]." C.O. estimated that the touching occurred when he was five or six, stating that was "as far back as [he could] remember." The touching stopped when his family moved away. He stated "stuff like that" would happen "[e]very two nights or so. Every time [he] stayed the night most [of] the time."

¶ 23 According to C.O., defendant used both his hand and mouth to touch C.O.'s penis. He estimated that when he was in third or fourth grade, defendant would use his hand to touch C.O.'s penis. Defendant also put his penis inside C.O.'s mouth and C.O. would use his hand and mouth to touch defendant's penis. He stated defendant would show him how to "[j]erk [defendant] off" by moving C.O.'s hand "down there" and telling C.O. "how to do it."

¶ 24 C.O. testified he did not remember how many times each sexual act occurred. When asked if he remembered the first time "it happened," C.O. stated: "Not really. It was when I was four or three." He testified he knew the abuse was occurring when he was in third and fourth grade and that it stopped when his family was "about to move."

¶ 25 C.O. recalled that when the abuse first started, he "liked the feeling" and "didn't know it was wrong." Initially, he did not tell any adults about what was happening because he

"didn't really think it was bad ***." In about fifth grade, he began to think what was happening was "bad." However, he still did not report what was happening with defendant because he was "scared," he "didn't want anybody to know," and he "felt bad." C.O. explained that he was scared people would not believe him.

¶ 26    In March or April 2018, C.O.'s mother asked him "if anything had happened." He did not disclose any information to her because he "didn't want to come out yet saying that stuff." Also, he "didn't think [his mother] would believe [him] at first." C.O. stated he didn't like talking about the abuse and it made him feel nervous. He denied that he told his family the details of the abuse or that he talked about the abuse with J.O. After his family moved away from defendant's neighborhood, he kept in contact with defendant and Diane and their relationship "stayed good."

¶ 27    On cross-examination, C.O. testified that once he started visiting defendant and Diane's home, J.O. "stopped going over." C.O. did not remember the first time he went to defendant and Diane's home. When questioned by defense counsel regarding when the abuse began, C.O. testified as follows:

"A. No, I don't remember. I was around three.

Q. I'm sorry?

A. I know it was around three when it started.

Q. When you were around three years old?

A. Yeah.

Q. Oh, okay.

A. That's when I first started remembering—

Q. Do you have a memory of that starting at three years old?

A. No, not really.

Q. Then how would you know it started at three if you don't have memories of three years old?

A. I don't remember that far.

Q. Huh?

A. It didn't start at three. I can't remember.

Q. Do you know when it did start?

\* \* \*

A. No."

C.O. stated he did not remember reporting to anyone that the abuse may have started when he was "in first, third, fourth, fifth, or sixth grade." However, after defense counsel asked him about an interview at the Child First Center with a woman named Alison Elsea, C.O. recalled making a similar statement to Elsea. C.O. did not remember ever reporting that the abuse happened 20 or 30 times. However, he did recall previously reporting that it occurred "twice a week for close to a year."

¶ 28 On further cross-examination, C.O. testified that when he was with defendant in defendant's bedroom, the door would be shut. Defendant exposed his penis when they were in defendant's bed and C.O. observed defendant with an erect penis. C.O. stated he did not remember how many times he and defendant engaged in oral sex with one another, but remembered telling Elsea that he thought those acts occurred "a couple times." C.O. also agreed that he did not have a very good memory and that he had "trouble recalling things."

¶ 29 On redirect examination, C.O. testified he remembered being sexually abused by defendant, which included defendant putting his hand on C.O.'s penis and defendant putting his penis in C.O.'s mouth. He testified he did not remember every time "it happened" because it was

- 10 -

"too far back to remember" and there had "been a lot of years since then." C.O. testified he tried not to think about the abuse and that he could not remember every individual instance of abuse because "it happened so many times[.]" He stated he had no specific memory of the first time the abuse started and did not "remember that far back." He just knew that the abuse "was happening for a while."

¶ 30    C.O. further testified he remembered the police getting called and, approximately a week later, being interviewed by Elsea at the Child First Center. During the interview, he was nervous. He stated he was "just trying to get [the interview] done" and "[t]here was a lot more [he] didn't say ***." C.O. further explained that he was nervous because he "didn't want to do" the interview.

¶ 31    Following C.O.'s testimony, the State submitted a recording of an August 2018 police interview with defendant and Diane. A portion of the recording was played for the jury. The record reflects that during the interview, defendant and Diane were informed of J.O. and C.O.'s allegations against defendant. The couple acknowledged that J.O. and C.O. stayed overnight at their home and sometimes slept in bed with defendant.

¶ 32    At the close of the State's case, defendant moved for a directed verdict in his favor as to all 11 counts against him, arguing the State failed to establish each and every element of the charged offenses. He argued there was a lack of specificity regarding when the abuse occurred and insufficient proof that the alleged sexual acts were "for the sexual arousal or gratification of either the victim *** or the defendant. In response, the State raised no objection to defendant's motion as it pertained to counts VI and VII, charging defendant with predatory criminal sexual assault of C.O., and counts X and XI, charging defendant with aggravated criminal sexual abuse of C.O. It noted each of those counts alleged sexual acts occurring from July 1, 2011, to August 28, 2012,

- 11 -

and conceded that time frame was not supported by the testimony presented. The State asked the court to deny the motion as to the remaining counts. Ultimately, the trial court granted defendant's motion as to counts VI, VII, X, and XI, but denied his motion as to all remaining counts.

¶ 33       Prior to defendant's presentation of evidence, his counsel made an offer of proof with respect to Diane's previously excluded testimony. Diane testified she and defendant had been married for 46 years. In 1996, defendant had two strokes. Before the strokes, she and defendant "had a good sexual relationship." Diane asserted they had sexual intercourse every day and sexual activity between the two was usually initiated by defendant. After the strokes, defendant required a lot of medications and the couple's "sex life stopped." Diane testified she and defendant made "several" attempts to continue their sexual relationship, but defendant could not get an erection. She estimated that they "tried off and on for a year" but the situation became frustrating, and defendant became uninterested. Diane maintained defendant never tried to initiate a sexual relationship after those attempts. Additionally, since that time, she had not observed defendant with an erection.

¶ 34       On cross-examination, Diane testified defendant's two strokes both occurred in April 1996. She estimated that the couple's last attempt at sexual intercourse was 20 to 25 years earlier.

¶ 35       Following the offer of proof, defendant's counsel asked the trial court to reconsider its earlier ruling to bar testimony from Diane regarding her sexual relationship with defendant. He asserted Diane's testimony would be relevant to rebut evidence regarding "defendant having an erection as late as 2005 to 2009." The State asked the court to deny defendant's motion to reconsider, noting, in part, that Diane's testimony showed the last time she and defendant attempted to have sex was in 1999 and, thus, there was "no way that she could speak to anything

- 12 -

that happen[ed] after that." Ultimately, the court denied defendant's motion.

¶ 36    During defendant's case in chief, Diane testified she and defendant had been married for 46 years. Until 2012, they lived on MacArthur Road in Decatur, next door to J.O. and C.O.'s grandmother. She stated J.O. began coming over to their residence when he was between five and seven years old. He would visit "a lot" and would sometimes spend the night. When J.O first began visiting, she and defendant shared a bedroom and J.O. would sleep in bed with both of them. Eventually, Diane and defendant occupied separate bedrooms. Diane acknowledged there were times that J.O. spent the night when she and defendant had separate bedrooms and, as a result, she "wasn't always in bed with [J.O. and defendant]."

¶ 37    Diane testified the bedrooms at her MacArthur Road residence were on the same side of the hallway and separated by 13 feet. She maintained the bedroom doors were always open and she "never slept with doors shut." From 2005 to 2011, Diane worked outside of the home until 3:30 p.m. When J.O. would stay the night, she was always present in the home. Diane agreed there was a time when J.O. "didn't come over as much," but asserted they, nevertheless, "always kept in contact."

¶ 38    Diane estimated C.O. was about six when he began staying with her and defendant. Sometimes, J.O. and C.O. would visit together but most of the time they took turns staying the night. C.O. usually wanted to sleep in defendant's room and watch cartoons. Diane denied ever observing anything inappropriate when J.O. and C.O. visited. After she and defendant moved in 2012, they kept in contact with J.O. and C.O. by sending birthday and Christmas cards and talking on the phone. On cross-examination, Diane estimated that she and defendant began occupying separate bedrooms in 2006 or 2007.

¶ 39    Defendant next testified on his own behalf. He stated he was 68 years old and

- 13 -

resided on MacArthur Road in Decatur until 2012, when he and Diane moved first to Texas and then to Florida. He described his MacArthur residence as a small, two-bedroom home. He was not sure how old J.O. and C.O. were when he first met them but estimated that they were around four or five. He recalled spending time first with J.O. and then C.O. Sometimes, the boys visited together but, most times, they visited separately because they would fight. When J.O. and C.O. would spend the night, they usually slept in bed with defendant but sometimes, they slept in bed with Diane.

¶ 40    Defendant testified he suffered strokes in 1996. Thereafter, he was physically slower. He had also been unable to achieve an erection and had no "sexual desires." Defendant denied ever touching J.O. and C.O. in an inappropriate manner or that either boy ever touched him inappropriately. He maintained he never placed his penis in either J.O. or C.O.'s mouth, nor had J.O. or C.O. placed their penises in his mouth.

¶ 41    On cross-examination, defendant agreed that he had a close relationship with J.O. and C.O. and thought of them like grandchildren. They were at his house "a lot" and individually spent the night at least once a week.

¶ 42    Following defendant's testimony, the defense rested. On the third day of defendant's jury trial, the trial court addressed and denied defendant's motion for a directed verdict and the parties' presented their closing arguments. At 11:49 a.m., the jury began its deliberations. At approximately 2 p.m., the jury asked if they could "read the original police report and the report from [the] Child First [Center]," materials not presented as evidence in the case. The jury also asked about Elsea's "credentials." With no objection from either party, the trial court instructed the jury that they had received all of the evidence in the case and should rely on their own independent recollection of that evidence.

¶ 43　　　　　After approximately three and a half hours of deliberation, the jury foreperson informed the court security officer that the jury was "not able to come up to an agreement." The trial court sent a note to the jury saying "[p]lease continue to deliberate." Approximately 30 minutes later, at 4:10 p.m., court proceedings recommenced with the jury having reached a verdict. It found defendant guilty of aggravated criminal sexual abuse as alleged in counts II and VIII, based upon contact between defendant's hand and the penis of both J.O. and C.O. The jury found defendant not guilty of all remaining counts.

¶ 44　　　　　In November 2019, defendant filed a motion for a new trial and a motion for a judgment notwithstanding the verdict or, in the alternative, a new trial. Defendant argued, in part, that the evidence was insufficient to establish his guilt beyond a reasonable doubt and the trial court erred by excluding portions of Diane's testimony. In December 2019, the court conducted a hearing and denied both of defendant's posttrial motions. In January 2020, the court sentenced defendant to two, concurrent four-year prison terms. Defendant filed a motion to reconsider, arguing the court erred by denying his posttrial motions and that his sentences were excessive. In May 2020, the court denied defendant's motion.

¶ 45　　　　　This appeal followed.

¶ 46　　　　　　　　　　　　　　II. ANALYSIS

¶ 47　　　　　　　　　　　　　A. Sufficiency of the Evidence

¶ 48　　　　　On appeal, defendant first challenges the sufficiency of the evidence against him, arguing the State failed to prove beyond a reasonable doubt that he committed the alleged acts of sexual conduct with either J.O. or C.O. He asserts his case presented a credibility contest between himself and J.O. and C.O, whose testimony was so "incomplete, inconsistent, and incredible" that the State could not meet its burden of proof.

¶ 49    "The State has the burden of proving beyond a reasonable doubt each element of an offense." *People v. Gray*, 2017 IL 120958, ¶ 35, 91 N.E.3d 876. "When a defendant challenges the sufficiency of the evidence, a reviewing court must determine whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *People v. Jackson*, 2020 IL 124112, ¶ 64, 162 N.E.3d 223. "The trier of fact remains responsible for resolving conflicts in the testimony, weighing the evidence, and drawing reasonable inferences from the facts," and "[t]he reviewing court does not retry the defendant." *People v. Harris*, 2018 IL 121932, ¶ 26, 120 N.E.3d 900. On review, "[a] criminal conviction will not be set aside on a challenge to the sufficiency of the evidence unless the evidence is so improbable or unsatisfactory that it creates a reasonable doubt of the defendant's guilt." *Jackson*, 2020 IL 124112, ¶ 64.

¶ 50    Further, "[t]he testimony of a single witness is sufficient to convict if the testimony is positive and credible, even where it is contradicted by the defendant." *Gray*, 2017 IL 120958, ¶ 36. While a fact finder's decision to accept witness testimony is not conclusive and does not bind a reviewing court, it is entitled to great deference. *People v. Cunningham*, 212 Ill. 2d 274, 280, 818 N.E.2d 304, 308 (2004). Testimony may be found insufficient "only where the record evidence compels the conclusion that no reasonable person could accept it beyond a reasonable doubt." *Id.* "A conviction will not be reversed simply because the evidence is contradictory or because the defendant claims that a witness was not credible." *Gray*, 2017 IL 120958, ¶ 36.

¶ 51    Relevant to this appeal, a person commits aggravated criminal sexual abuse if he or she was 17 years of age or over and committed "an act of sexual conduct with a victim who was under 13 years of age when the act was committed[.]" 720 ILCS 5/12-16(c)(1)(i) (West 2010). Sexual conduct includes "any intentional or knowing touching or fondling by *** the accused,

either directly or through clothing, of the sex organs *** of the victim ***." *Id.* § 12-12(e).

¶ 52                              1. *Aggravated Criminal Sexual Abuse of J.O.*

¶ 53           With respect to defendant's conviction for aggravated criminal sexual abuse as alleged in count II, describing contact between his hand and J.O.'s penis, defendant argues J.O.'s testimony was neither positive nor credible. As a result, he maintains the evidence cannot support a rational determination of guilt. We agree that the record shows the State failed to carry its burden of proving the specific sexual conduct alleged in count II and, thus, reversal of defendant's conviction for that offense is required.

¶ 54           As stated, "[t]he testimony of a single witness is sufficient to convict if the testimony is positive and credible, even where it is contradicted by the defendant." *Gray*, 2017 IL 120958, ¶ 36. According to Black's Law Dictionary, "positive testimony" is also termed "affirmative testimony" and refers to "[t]estimony about whether something occurred or did not occur, based on what the witness saw or heard at the time and place in question." Black's Law Dictionary (11th ed. 2019); see also *id.* (stating "direct evidence" is "[a]lso termed positive evidence" and means "[e]vidence that is based on personal knowledge or observation and that, if true, proves a fact without inference or presumption").

¶ 55           Here, as argued by defendant, the only evidence establishing the various sexual acts alleged by the State came from the testimony of J.O. and C.O. Both witnesses testified about their own alleged abuse by defendant. The record shows J.O. testified defendant repeatedly sexually abused him over a period of several years. He explicitly described contact between his penis and defendant's legs and mouth, his hand and defendant's penis, and his mouth and defendant's penis. Significantly, no testimony was elicited from J.O. that described contact between his penis and defendant's hand. The parties point out that, in responding to a series of questions from the State

about whether J.O. knew how many times each of the alleged sex acts occurred, J.O. stated he did not know how many times defendant's hand touched his penis. However, as argued by defendant, such a denial falls short of a positive or affirmative assertion that the alleged act, in fact, occurred. Alone, it was not sufficient to establish defendant's guilt of the offense alleged in count II.

¶ 56        On appeal, the State cites to different portions of J.O.'s testimony, which it asserts implied that defendant touched J.O.'s penis. However, as argued by defendant, the cited testimony either refers to sexual acts other than defendant's hand on J.O.'s penis or includes only general references to sexual abuse or "touching" from which any type of sexual contact could be inferred. The testimony referenced by the State is similarly insufficient to establish the occurrence of the specific conduct alleged in count II.

¶ 57        The State further references J.O.'s testimony on cross-examination, wherein he acknowledged that he previously told the police that defendant would perform oral sex on him and fondle his penis. However, as defendant points out, J.O. did not testify that his prior statement was true and, in fact, maintained some portions were incorrect when questioned by defense counsel. See Fed. R. Evid. 801 (advisory committee notes to subdivision (d)(1)) ("If the witness admits on the stand that he made the [prior] statement and that it was true, he adopts the statement and there is no hearsay problem."); *People v. Morse*, 33 Ill. App. 3d 384, 390, 342 N.E.2d 307, 312 (1975) (noting a witness adopted a prior statement as present testimony when he admitted that the prior statement was true). J.O.'s acknowledgment that he made a prior statement did not adopt that statement as his present testimony.

¶ 58        Ultimately, the record reflects there was no positive or affirmative statement from J.O. at trial that the specific sexual conduct alleged in count II had occurred. Under such circumstances, no rational trier of fact could have found each element of the charged offense

proved beyond a reasonable doubt. Accordingly, we agree with defendant that his conviction for aggravated criminal sexual abuse based on count II must be reversed.

¶ 59                    2. *Aggravated Criminal Sexual Abuse of C.O.*

¶ 60          With respect to aggravated criminal sexual abuse as alleged in count VIII, describing contact between defendant's hand and C.O.'s penis, defendant argues C.O.'s testimony was not credible. He contends the evidence suggests C.O. was coerced into making false allegations against him, and he asserts that C.O.'s testimony contained significant inconsistencies with respect to when the abuse began and how often it occurred. Defendant further points out that C.O. acknowledged that he did not have a good memory. According to defendant, the deficiencies in C.O.'s testimony were so great that no person could have accepted his testimony as credible beyond a reasonable doubt. We disagree.

¶ 61          At trial, C.O. testified he began spending the night at defendant and Diane's house when he was very young. During those visits, he slept in a bed with only defendant. C.O.'s testimony regarding those sleeping arrangements was supported by both defendant and Diane's testimony. C.O. further described various sexual acts that occurred with defendant, and explicitly described contact between his penis and defendant's hand. As indicated by defendant on appeal, the record reflects C.O. was uncertain about when the abuse began. Also, C.O.'s testimony regarding his age and grade level when the abuse ended and the frequency with which it occurred was inconsistent with other evidence presented. Given his young age at the time of the abuse and the length of time that had passed since the abuse occurred, we do not believe such uncertainties or inconsistencies were fatal to C.O.'s credibility. Ultimately, C.O. was able to state that the abuse began when he was very young and continued on a frequent basis until his family moved. The evidence established that move occurred in February 2011. Abuse that was ongoing up to February

- 19 -

2011 was consistent with the time frame alleged by the State in count VIII.

¶ 62    Additionally, we disagree that the evidence showed C.O. was coerced into falsely accusing defendant. Although C.O.'s testimony indicated he was reluctant to come forward with his allegations against defendant, he explained his reluctance by noting he was scared people would not believe him. C.O.'s testimony also indicated he was embarrassed by what had happened. A rational trier of fact could have accepted C.O.'s testimony as credible.

¶ 63    We find the State presented sufficient evidence to support each element of the specific offense charged in count VIII. The inconsistencies in C.O.'s testimony did not destroy his credibility and, thus, the evidence presented was sufficient to establish defendant's guilt beyond a reasonable doubt.

¶ 64                    B. Exclusion of Defense Evidence

¶ 65    On appeal, Defendant also contends the trial court abused its discretion by granting the State's motion *in limine* to bar Diane from testifying about "her personal observations of [his] sexual desire and function." He argues "Diane's proffered testimony that she had never seen [him] with an erection since the 1996 strokes" would have corroborated his testimony that he was unable to achieve an erection since 1996 and discredited testimony from J.O. and C.O. that they observed defendant with an erection at the time of the abuse. Thus, he maintains the evidence was relevant to issues of credibility in the case.

¶ 66    "A motion *in limine* is addressed to a trial court's power to admit or exclude evidence or argument." *In re Commitment of Lingle*, 2018 IL App (4th) 170404, ¶ 47, 103 N.E.3d 564. "These motions bring to the trial court's attention potentially irrelevant, inadmissible, or prejudicial evidence and seek a pretrial order excluding or permitting the evidence." *Id.* "The trial court's evidentiary ruling on a motion *in limine* is reviewed for an abuse of discretion." *Id.* "An

abuse of discretion occurs only when the trial court's ruling is arbitrary, fanciful, or such that no reasonable person would take the view adopted by the trial court." *Id.*

¶ 67         Generally, "[a]ll relevant evidence is admissible, except as otherwise provided by law," and "[e]vidence which is not relevant is not admissible." Ill. R. Evid. 402 (eff. Jan. 1, 2011). " 'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Ill. R. Evid. 401 (eff. Jan. 1, 2011). However, a trial "court may reject evidence on the grounds of relevancy if the evidence is remote, uncertain, or speculative." *People v. Ursery*, 364 Ill. App. 3d 680, 686, 848 N.E.2d 146, 152 (2006). Additionally, "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise." Ill. R. Evid. 702 (eff. Jan. 1, 2011).

¶ 68         Here, during the offer of proof, Diane testified that she and defendant had a lengthy marriage and, prior to 1996, an active sex life. In 1996, defendant suffered two strokes. According to Diane, she and defendant made "several" attempts to continue their sexual relationship, but defendant could not achieve an erection. The last time she and defendant attempted a sexual relationship was in 1999. Diane further testified that since defendant's strokes in 1996, they had no type of sexual relationship and she had not observed him with an erection.

¶ 69         The record reflects the trial court rejected Diane's proffered testimony on relevancy grounds. We find no abuse of discretion in that determination. The record indicates that through Diane's testimony, defendant was attempting to show that it was not physically possible for him to achieve an erection following his strokes in 1996. However, Diane was not a medical expert,

and her proffered testimony could not have shown, and did not tend to show, that defendant was physically incapable of that bodily function. Significantly, Diane's observations of defendant in a sexual context were also remote in time from the allegations of abuse. During the offer of proof, Diane acknowledged that she and defendant last attempted to engage in any sexual activity in approximately 1999. Defendant's alleged abuse of J.O. and C.O. did not occur until 6 to 10 years later. It was not error for the court to determine that Diane's observations of defendant's sexual function between 1996 and 1999 did not speak to his sexual abilities in an entirely different context nearly a decade later. Accordingly, we find no error in the exclusion of Diane's proffered testimony.

¶ 70                                    III. CONCLUSION

¶ 71        For the reasons stated, we reverse defendant's conviction for aggravated criminal sexual abuse as alleged in count II but otherwise affirm the trial court's judgment.

¶ 72        Affirmed in part and reversed in part.

¶ 73        JUSTICE STEIGMANN, dissenting:

¶ 74        Because I disagree that J.O.'s testimony was not sufficient to sustain defendant's conviction, I respectfully dissent. I also believe the analysis in paragraph 57 of this Rule 23 order is not correct.

¶ 75        In the context of J.O.'s relating to the jury this lengthy and long-ago series of unpleasant and embarrassing events, the jury could have completely accepted J.O.'s testimony on cross-examination that what he told the police about how defendant would fondle his penis was, in fact, what happened. I believe there was absolutely no need for J.O. to say something along the line, "and what I told them was true" after he testified to what he had told the police. And my distinguished colleagues in the majority cite no case law imposing such a requirement. One

probable reason for the absence of any such case law is that, in context, a jury will likely infer that when a person recounts what he told the police, he is saying that what he told them was true.

¶ 76    Further, to the extent that what he told the police was arguably hearsay, it is not a problem. First, hearsay admitted without objection can be given its natural probative weight. *People v. Harris*, 2012 IL App (1st) 100077, ¶ 26, 966 N.E.2d 496; *People v. Banks*, 378 Ill. App. 3d 856, 861, 883 N.E.2d 43, 48 (2007); *People v. Tara*, 367 Ill. App. 3d 479, 486, 867 N.E.2d 961, 969 (2006). Not only was this testimony not objected to, defendant elicited it on cross-examination. Thus, the alleged hearsay issue in this case is somewhat similar to the issue in *People v. Ramsey*, 205 Ill. 2d 287, 293, 793 N.E.2d 25, 29 (2002), in which the Illinois Supreme Court, in a death penalty case, rejected the defendant's hearsay claim, affirmed his conviction and sentence, and wrote the following:

> "Defendant argues that [the witness' testimony at issue] was hearsay. That testimony, however, was procured by the defense. [The witness] made the statement while testifying as a defense witness. Where a party himself introduces or elicits certain evidence, he cannot later complain. [Citation.] Moreover, the failure to object to hearsay not only waives the issue on appeal, but allows the evidence to be considered by the trier of fact and to be given its natural probative effect."

¶ 77    Second, consistent with everything else about which J.O. was testifying, the jury would have been entirely justified—and, I believe, correct—to accept what he told the police as being true.

¶ 78    It is true J.O. testified that other statements he made to the police were false, perhaps thereby causing one to wonder how the jury would know if J.O.'s statement in question was true

or false. However, such speculation strikes me as simply disagreeing with the jury's assessment of the evidence.

¶ 79    Importantly, paragraph 16 of the Rule 23 order establishes that on direct examination, J.O. was asked if he knew how many times defendant touched his penis with his hand, and J.O. answered, "No, I do not." J.O. did not answer "zero" or "that never occurred." He answered the same way when asked if he knew how many times various other types of sexual contact occurred. At the end of that testimony, he explained that he did not know because it happened too often.

¶ 80    The jury could easily have inferred from defendant's answer to just that question, or from his answers to the series of questions set forth in paragraph 16, that J.O. affirmed that defendant touched his penis too many times to recount. This would be positive, affirmative evidence that defendant touched J.O.'s penis, which would, by inference, corroborate J.O.'s statement to the police that defendant touched his penis.

¶ 81    Third, as hearsay goes, this situation is hardly what the hearsay prohibition was designed to prohibit. After all, the hearsay declarant, J.O., was on the stand, subject to cross-examination, and was in fact cross-examined about this subject. That's how the statement was elicited in the first place.

¶ 82    The majority cites *People v. Morse* (*supra* ¶ 57), but that case does not impose a requirement here that J.O. needed to reaffirm, "And what I told them was true." *Morse* addressed the question of whether the trial court erred by allowing the State to examine an accomplice as a hostile witness—a situation that the court warns "must be viewed with suspicion and be properly circumscribed." The *Morse* court observed that the accomplice "admitted that his prior statement was true, thus adopting it as his present testimony," but *Morse* neither cited to any authority

- 24 -

imposing such a requirement nor did *Morse* itself hold there to be such a requirement. Instead, it appears the *Morse* court made that observation to demonstrate that the questioning of the accomplice was conducted carefully, given the suspicion inherent in accomplice testimony. The situation in *Morse* has nothing to do with the situation before this court in this case.

¶ 83       Further, imposing such a requirement would be inconsistent with the cases I earlier cited about how the trier of fact may give admitted hearsay its natural probative weight.

¶ 84       Had I been a member of the jury, I would not have had any difficulty accepting J.O.'s testimony about his statement to the police, especially given the circumstances about which he was testifying. Further, J.O.'s acknowledgement that some of his statements to the police were false should hardly diminish his credibility in the eyes of the jury. After all, one reasonable inference based upon that testimony is that all of J.O.'s other statements were true. And this inference is strengthened by the fact that defense counsel did not further pursue the matter regarding some of J.O.'s statements to the police being false.

¶ 85       Last, I again emphasize that the testimony in question—namely, what J.O. told the police—was elicited on cross-examination. So, if defense counsel did not like the answer or thought it needed clarification, he could have pursued the matter. That he did not suggests he knew he would not like J.O.'s further testimony on this point.

¶ 86       For these reasons, I believe J.O.'s testimony was sufficient to sustain defendant's conviction and would affirm.