NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2023 IL App (4th) 220199-U

NO. 4-22-0199

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
March 21, 2023
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | Peoria County |
| DEONTRAY JOHNSON, | ) | No. 12CF1040. |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | Kevin Lyons, |
| | ) | Judge Presiding. |

JUSTICE DOHERTY delivered the judgment of the court.
Presiding Justice DeArmond and Justice Zenoff concurred in the judgment.

**ORDER**

¶ 1    *Held*:    Defendant's 36-year sentence for first degree murder is affirmed where it is within the statutory range and the trial court properly considered relevant factors and evidence in mitigation and aggravation before imposing sentence.

¶ 2    Following a jury trial, defendant Deontray Johnson was found guilty of first degree murder and of personally discharging a firearm that proximately caused the death of another person. Defendant was sentenced to 36 years in prison for first degree murder. On appeal, defendant claims that his sentence is excessive because the trial court failed to give adequate weight to mitigating evidence presented at the sentencing hearing. For the reasons that follow, we affirm.

¶ 3    I. BACKGROUND

¶ 4    The underlying facts of this case are adequately set out in the Third District Appellate Court's original decision in this case. See *People v. Johnson*, 2015 IL App (3d) 130543-

U. Therefore, we set out only those facts necessary to resolve this appeal. Following a 2013 jury trial, defendant was found guilty of first degree murder (720 ILCS 5/9-1(a)(1),(2) (West 2012)) and aggravated unlawful use of a weapon (720 ILCS 5/24-1.6(a)(1) (West 2012)). The jury made a separate finding that, during the commission of first degree murder, defendant personally discharged a firearm that proximately caused death to another person (730 ILCS 5/5-8-1(a)(1)(d)(iii) (West 2012)). The evidence presented at trial established that the shooting happened when defendant was out with friends during the early-morning hours of June 19, 2012. One of the individuals with defendant at a night club got into an altercation with the victim, Robreco King. The argument continued outside of the club, where defendant and other individuals became involved. At some point during the altercation, defendant shot the unarmed victim in the back, resulting in his death. Defendant was initially given a cumulative sentence of 80 years in prison: 50 years in prison for murder plus a 30-year enhancement for personally discharging a firearm. The Third District Appellate Court affirmed that conviction and sentence on appeal. See *Johnson*, 2015 IL App (3d) 130543-U.

¶ 5 Our supreme court then issued a supervisory order directing the appellate court to vacate its prior judgment and "consider the effect of this Court's opinions in *People v. Buffer*, 2019 IL 122327, and *People v. Holman*, 2017 IL 120655, on the issue of whether defendant's sentence constitutes a *de facto* life sentence in violation of the Eighth Amendment and *Miller v. Alabama*, 567 U.S. 460 (2012), and determine if a different result is warranted." The Third District Appellate Court vacated its prior decision and issued a new judgment affirming defendant's conviction but vacating his 80-year sentence and remanding the case to the trial court for a new sentencing hearing. *People v. Johnson*, 2020 IL App (3d) 130543-B. The Third District Appellate Court directed the trial court to "consider defendant's youth and its attendant characteristics as required

in *Miller*" and instructed that on remand, defendant was "entitled to be sentenced under the juvenile sentencing scheme prescribed by section 5-4.5-105 of the Unified Code of Corrections." *Id.* at ¶ 35.

¶ 6 An updated presentence investigation report (PSI) was filed prior to the new sentencing hearing. The PSI showed that in 2019, while defendant was in custody for the murder conviction, he pled guilty to unlawful possession of a controlled substance in a penal institution and received an additional five-year sentence. The PSI also shows that several incident reports were issued while defendant was in custody arising from his refusal to follow the orders of jail staff. Defendant's juvenile delinquency history included aggravated robbery, a curfew violation, disorderly conduct, and possession of a stolen motor vehicle. While incarcerated, defendant was prescribed medications for depression, anxiety, and bipolar disorder, and he was placed on suicide watch on several occasions. Defendant reported that he was working to earn his GED while in custody and that he was close to his family and girlfriend. Defendant's girlfriend submitted a supportive letter stating that she had known defendant for approximately 10 years and that he was a loving person who had grown and changed for the better. The PSI also included a victim impact statement submitted by the victim's mother and a letter in mitigation submitted by defendant's sister.

¶ 7 The sentencing hearing was held on May 12, 2021. The victim's mother testified by reading her victim impact statement, in which she related that the victim was her first child and she and her family loved him "more than anything." She explained that her family and the entire community were "devastated" when her son was killed, and she felt that defendant acted "cowardly" when he made a "conscious decision" to shoot and kill her son.

¶ 8            Dr. James Garbarino, a professor of psychology and human development, submitted a mitigation report and testified on defendant's behalf. The doctor explained that "developmental psychology" involves the processes by which human beings become social, cultural, and psychological beings over the course of a lifetime. The doctor specialized in childhood and adolescent development and the impact of trauma, violence, and other adverse factors. The trial court admitted Dr. Garbarino as an expert in the field of developmental psychology.

¶ 9            In preparation for his report and testimony, Dr. Garbarino reviewed the PSI, the transcript from the prior sentencing hearing, and reports generated by police and jail personnel. He did not review the trial transcript and did not personally meet with defendant. Dr. Garbarino communicated with defendant in writing, which included having defendant answer 10 written questions known as the "Adverse Childhood Experiences" (ACE) questionnaire. Defendant scored 6 out of 10 on the ACE questionnaire, which indicated he had adversity issues from psychological maltreatment, physical abuse, physical neglect, parental separation, living with a substance abuser, and living with a household member who went to prison. Dr. Garbarino testified that defendant's score was "high" and greater than approximately 97 out of 100 adolescents. However, defendant's score was "not as high" as many individuals who are incarcerated for murder, who average a score of 7 and sometimes score a 9 or 10. Defendant's score indicated that "he experienced a lot of adversity" as he grew up, "not as much as some others, but still worse than, you know, 96 out of 100 people growing up."

¶ 10           Dr. Garbarino testified that he was familiar with the United States Supreme Court's decision in *Miller* and the sentencing factors a court must consider related to "youth and their attending characteristics." The doctor explained that the first factor, "immaturity and impetuosity,"

is based on the notion that adolescent brains do not mature until age 25; consequently, adolescents have a reduced capacity to consider the future consequences of their actions. The second factor, "family and home environment," is based on the notion that brain development is affected by the quality of social experiences. The third factor is the "circumstances of the offense," which includes the role that youth played in the incident and the influence of peer pressure. Dr. Garbarino testified that the mere presence of peers, even without overt pressure, can result in deteriorating decision-making function in teenagers. The fourth factor is "impaired legal competence," and it recognizes that youth are at a disadvantage when dealing with police or legal proceedings. The fifth factor is the "youth's potential for rehabilitation," which Dr. Garbarino believed was the most important consideration. This factor is based on research indicating that it is "almost impossible" to predict the capacity for rehabilitation based on negative behavior exhibited as a teenager. Dr. Garbarino explained that "many youth who commit horrible, violent crimes as teenagers over a period of 20 years or more do engage in rehabilitation and emerge not just safe, but in some cases are remarkably transformed." This principle is important because it goes to the "core of the *Miller* decision which was that mandatory life without parole for teenagers shouldn't be happening and certainly is not something that is justified by the crimes they commit." Dr. Garbarino believed that although *Miller* involved a mandatory life sentence without parole, the "developmental perspective" at the core of that decision was relevant to *de facto* life sentences such as the one defendant originally received in this case.

¶ 11        Dr. Garbarino applied the *Miller* factors to defendant's case in reaching his ultimate conclusions. The doctor testified that defendant demonstrated behavior as a youth, including the murder, that reflected immature thinking and lack of emotional control. Defendant's "adolescent brain at age 17 undermined his ability to make good decisions." Defendant reported disturbing

childhood trauma, and the high level of adversity he experienced in childhood was "exactly the kind of family situation the Supreme Court had in mind in [*Miller*]." Defendant was with a group of youths when the crime took place, and he now sees the negative effect that these people had on him. Further, although defendant continued to deny that he was the shooter, he acknowledged that he was "present." At 17 years old, defendant was also not able to meaningfully assist with his defense in court. Defendant's future criminal behavior could not be accurately predicted at that age because there was no correlation between his behavior during the offense and his prospects for rehabilitation.

¶ 12　　　　Dr. Garbarino opined that defendant had the capacity for rehabilitation when the crime occurred and that, in the intervening eight years, he had demonstrated such potential. Defendant had shown greater insight, decision-making ability, and emotional intelligence. Defendant was not irreparably damaged or a psychopath and did not suffer from antisocial personality disorder. Ultimately, Dr. Garbarino believed that defendant had rehabilitative potential and that he should be resentenced to a term that would allow him to be released and become a productive member of society.

¶ 13　　　　Dr. Garbarino acknowledged that defendant's rehabilitation and improved decision-making and emotional intelligence were "certainly not complete." Defendant had engaged in "problematic" behavior "at least until very recently," and he "certainly has a long way to go." Additionally, defendant's ongoing mental health issues, which could explain his negative behavior in prison, were a "point of concern."

¶ 14　　　　Under questioning by the trial court, Dr. Garbarino testified that a sentence of 20 years' imprisonment is sufficient for most individuals. After 20 years, most of those individuals demonstrate that continuing to incarcerate them was a "waste of everybody's time." Dr. Garbarino

noted that individuals with longer or life sentences had less access to education and other programs, whereas inmates with shorter sentences had greater access to these programs and greater motivation to improve because they knew they were "leaving at some point."

¶ 15        In allocution, defendant stated that his past conduct reflected poor decision-making and that he made a "mistake" and "picked the wrong crowd" of friends, which "led to these charges." Defendant apologized to both his family and the victim's family, and he expressed regret that the "crime occurred." He acknowledged that he was present at the scene and "accept[ed]" that he had been "found guilty" but maintained that he did not shoot the victim. Defendant stated that he had made "foolish," "selfish," and "immature" decisions in the past but maintained that he had since "grown and matured."

¶ 16        Before announcing sentence, the trial court stated that it had considered the PSI, defendant's allocution statement, the testimony provided by defendant's witnesses, the statutory factors in aggravation and mitigation, defendant's history and character, and "those factors that are relevant and pertinent with regard to *Miller v. Alabama* and 730 ILCS 5/5-4.5-105." The court also noted that defendant was eligible for parole 20 years after he began serving his sentence (730 ILCS5/5-4.5 (West 2020)), making his first parole hearing approximately 10 years from the date of resentencing.

¶ 17        The trial court stated that remarks defendant made to Dr. Garbarino and in court indicated that defendant now had a different perspective. The court observed that "for the last decade," defendant had been in the prison system surrounded by people who were likely negative influences and that, although he "very much" appeared to be an adult, defendant was still only 26 years old. Defendant was also with people "that may have had some impact" on him when he was younger, and the court noted that "conduct that people engage in when other bad actors are around

them is far different than when they're by themselves." The court was not sure "what the doctor was saying today because psychology and analysis is blurry sometimes, but the upshot of it is that a person is not in a position to make good decisions in a timely, well thought-out way when they're 17 or 16 or 15. In fact, [they] should not be able to do that for ten years or so." However, the court also stated that the facts of the case had not changed, in that a person was "still dead," and the "ugliness" of the crime would not "fade away" for the victim's family. The court concluded that it was not going to make "particular findings point by point," but that it had considered the "factors that are available" and recognized defendant's age at the time of the offense. However, defendant "decided to be there" and to possess a weapon. The trial court sentenced defendant to 36 years' imprisonment for first degree murder followed by 3 years of mandatory supervised release. The court chose not to impose a sentencing enhancement for personally discharging a firearm that proximately caused the death of another person. The court subsequently denied defendant's motion to reconsider his sentence.

¶ 18        This appeal followed.

¶ 19                                II. ANALYSIS

¶ 20        Defendant contends that the 36-year sentence imposed by the trial court is excessive and an abuse of discretion. Defendant claims that the court overlooked or failed to consider Dr. Garbarino's testimony as to the sentence defendant should receive and that the court failed to give due weight to other mitigating factors that warranted a lesser sentence.

¶ 21        A trial court has broad discretion in imposing a sentence, and its sentencing decisions are entitled to great deference and weight. *People v. Alexander*, 239 Ill. 2d 205, 212 (2010). A sentence within the permissible statutory range is presumed to be proper; a reviewing court may not substitute its judgment for that of the trial court and alter that sentence absent an

abuse of discretion. *Id.*; *People v. Sturgeon*, 2019 IL App (4th) 170035, ¶ 104. An abuse of discretion occurs only when the sentence imposed is "greatly at variance with the spirit and purpose of the law, or manifestly disproportionate to the nature of the offense." *People v. Stacey*, 193 Ill. 2d 203, 210 (2000).

¶ 22       The trial court must base its sentencing determination upon the circumstances of each case and all relevant aggravating and mitigating factors, including the nature of the offense and the defendant's character, age, and rehabilitative potential. *People v. Fern*, 189 Ill. 2d 48, 55 (1999). However, the weight to given to these factors and the balance to struck between them are matters committed to the trial court's discretion. *Sturgeon*, 2019 IL App (4th), ¶ 104; *People v. Crenshaw*, 2011 IL App (4th) 090908, ¶ 24. Likewise, the credibility of witnesses and the weight given to their testimony are also committed to the trial court's discretion. *People v. Brown*, 2015 IL App (1st) 130048, ¶ 31. A reviewing court gives great deference to the trial court in these matters "because the trial judge, having observed the defendant and the proceedings, has a far better opportunity to consider these factors than the reviewing court, which must rely on the 'cold' record." *Fern*, 189 Ill. 2d at 53. "The trial judge has the opportunity to weigh such factors as the defendant's credibility, demeanor, general moral character, mentality, social environment, habits, and age. [Citations.] Consequently, the reviewing court must not substitute its judgment for that of the trial court merely because it would have weighed these factors differently. [Citation.]." *Stacey*, 193 Ill. 2d at 209.

¶ 23       In *Miller*, the United States Supreme Court held that the eighth amendment forbids a sentencing scheme that mandates life in prison without the possibility of parole for juvenile offenders. *Miller*, 567 U.S. at 479. Although the court did not reach the question of whether the eighth amendment requires a categorical bar on life without parole for juveniles, the court stated

that such sentences should be uncommon given "children's diminished culpability and heightened capacity for change." *Id*. This was particularly the case given the "great difficulty *** of distinguishing at this early age between 'the juvenile offender whose crime reflects unfortunate yet transient immaturity, and the rare juvenile offender whose crime reflects irreparable corruption.' " *Id*. at 479-480 (quoting *Roper v. Simmons*, 543 U.S. 551, 573 (2005)). The court therefore required sentencing courts to "take into account how children are different, and how those differences counsel against irrevocably sentencing them to a lifetime in prison." *Id.* at 480.

¶ 24 After *Miller*, our legislature enacted section 5-4.5-105 of the Unified Code of Corrections (Code) (730 ILCS 5/5-4.5-105 (West 2016)). In relevant part, that section provides that when a person who is under 18 years of age commits an offense, the trial court "shall consider" the following mitigating factors in determining the appropriate sentence:

"(1) the person's age, impetuosity, and level of maturity at the time of the offense, including the ability to consider risks and consequences of behavior, and the presence of cognitive or developmental disability, or both, if any;

(2) whether the person was subjected to outside pressure, including peer pressure, familial pressure, or negative influences;

(3) the person's family, home environment, educational and social background, including any history of parental neglect, physical abuse, or other childhood trauma;

(4) the person's potential for rehabilitation or evidence of rehabilitation, or both;

(5) the circumstances of the offense;

- 10 -

(6) the person's degree of participation and specific role in the offense, including the level of planning by the defendant before the offense;

(7) whether the person was able to meaningfully participate in his or her defense;

(8) the person's prior juvenile or criminal history; and

(9) any other information the court finds relevant and reliable, including an expression of remorse, if appropriate. However, if the person, on advice of counsel chooses not to make a statement, the court shall not consider a lack of an expression of remorse as an aggravating factor." 730 ILCS 5/5-4.5-105(a) (West 2016)).

This section also gives the trial court discretion to "decline to impose any otherwise applicable sentencing enhancement based upon firearm possession *** with personal discharge that proximately causes *** death to another person." 730 ILCS 5/5-4.5-105(b) (West 2016)). Finally, the statute provides that "if the defendant is convicted of first degree murder and would otherwise be subject to sentencing under clause (iii), (iv), (v), or (vii) of subparagraph (c) of paragraph (1) of subsection (a) of Section 5-8-1 of this Code based on the category of persons identified therein, the court shall impose a sentence of not less than 40 years of imprisonment." 730 ILCS 5/5-4.5-105(c) (West 2016)).

¶ 25       In addition, section 5-4.5-115 of the Code governs parole for persons who are under the age of 21 at the time of the commission of the offense. See 730 ILCS 5/5-4.5-115(b) (West 2020)). That section states, in relevant part, that "[a] person under 21 years of age at the time of the commission of first degree murder who is sentenced on or after June 1, 2019 *** shall be eligible for parole review *** after serving 20 years or more of his or her sentence." *Id.*

¶ 26       Our supreme court held that, in light of *Miller* and its progeny, "sentencing a juvenile offender to a mandatory term of years that is the functional equivalent of life without the possibility of parole constitutes cruel and unusual punishment in violation of the eighth amendment." See *People v. Reyes*, 2016 IL 119271, ¶ 9. Then, in *Holman*, 2017 IL 120655, ¶¶ 38, 40, the court recognized that *Miller* was not limited to mandatory life sentences and that life sentences for a juvenile offender, whether discretionary or mandatory, violate the eighth amendment unless the trial court considers "youth and its attendant characteristics." The court held that "*Miller* applies to discretionary sentences of life without parole for juvenile defendants." *Id.* ¶ 40. The court then adopted an analytic approach, which required the trial court to specifically consider the characteristics mentioned in *Miller*, and it summarized the law regarding sentencing a juvenile to life in prison as follows:

"Under *Miller* and *Montgomery*[ *v. Louisiana*, 577 U.S. 190 (2016))], a juvenile defendant may be sentenced to life imprisonment without parole, but only if the trial court determines that the defendant's conduct showed irretrievable depravity, permanent incorrigibility, or irreparable corruption beyond the possibility of rehabilitation. The court may make that decision only after considering the defendant's youth and its attendant characteristics. Those characteristics include, but are not limited to, the following factors: (1) the juvenile defendant's chronological age at the time of the offense and any evidence of his particular immaturity, impetuosity, and failure to appreciate risks and consequences; (2) the juvenile defendant's family and home environment; (3) the juvenile defendant's degree of participation in the homicide and any evidence of

familial or peer pressures that may have affected him; (4) the juvenile defendant's incompetence, including his inability to deal with police officers or prosecutors and his incapacity to assist his own attorneys; and (5) the juvenile defendant's prospects for rehabilitation." *Id*. ¶¶ 46.

¶ 27 Finally, in *Buffer*, 2019 IL 122327, ¶ 29, the supreme court considered when a defendant's prison sentence is long enough to be considered a *de facto* life sentence without parole. The court noted that by enacting section 5-4-105 of the Code, the legislature "determined that the specified first degree murders that would justify natural life imprisonment for adult offenders would warrant a mandatory minimum sentence of 40 years for juvenile offenders." *Id*. ¶ 39. The court held that "a prison sentence of 40 years or less imposed on a juvenile offender does not constitute a *de facto* life sentence in violation of the eighth amendment," observing that this holding was rooted in the legislature's determination and provided juvenile offenders a "meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation. [Citation.]" *Id*. ¶¶ 40-41.

¶ 28 Turning to the present case, we initially note that the parties do not dispute that defendant was subject to a cumulative sentence of between 20 and 80 years' imprisonment and that a sentence greater than 40 years would be a *de facto* life sentence for him. The trial court sentenced defendant to 36 years in prison for first degree murder but declined to impose a sentencing enhancement for having personally discharged a firearm that proximately caused the death of the victim. Defendant therefore does not contend that his 36-year sentence is a *de facto* life sentence, nor does he dispute that his sentence falls within the statutorily permissible range. Accordingly, we presume that his sentence is proper, and we will not alter that sentence unless it

is greatly at variance with the purpose and spirit of the law or is manifestly disproportionate to the offense. See *Crenshaw*, 2011 IL App (4th) 090908, ¶ 22.

¶ 29 Defendant claims that the trial court failed to consider Dr. Garbarino's testimony that a sentence of greater than 20 years was unnecessary in order for defendant to be rehabilitated and returned to his community. Defendant asserts that because the court did not impose a *de facto* life sentence, it must have believed the doctor's testimony that defendant was not permanently incorrigible or otherwise deserving of a life sentence. Therefore, because the court credited this portion of Dr. Garbarino's testimony, defendant claims it was an abuse of discretion for the court to "overlook or reject" Dr. Garbarino's opinion regarding the sentence defendant should receive. We disagree.

¶ 30 The trial court's comments indicate that it considered the doctor's testimony before determining the appropriate sentence. The court's comments indicate that it also considered the other evidence presented at sentencing as it related to the factors set forth in *Miller* and codified in section 5-4.50-105 of the Code. As the finder of fact, it was the trial court's responsibility to determine the credibility of the witnesses, including Dr. Garbarino, and to assign weight to their testimony. See *Fern*, 189 Ill. 2d at 53; *People v. Calahan*, 272 Ill. App. 3d 293, 297 (1995). Based on the sentence imposed, it is evident that the court did not believe defendant was in that rare class of people whose conduct showed "irreparable corruption beyond the possibility of rehabilitation" who are deserving of a life sentence. See *Holman*, 2017 IL 120655, ¶ 46. Even if the trial court arrived at this determination by crediting a portion of Dr. Garbarino's testimony on that issue, the court was not required to accept his testimony that a sentence of greater than 20 years for defendant was unnecessary. As the fact finder, the trial court had discretion to accept part and reject part of the doctor's testimony. See *People v. Tara*, 367 Ill. App. 3d 479, 489 (2006) ("[T]he trial court is

free to accept or reject expert testimony in whole or in part."). Therefore, the fact that the court apparently rejected Dr. Garbarino's sentencing recommendation and instead imposed a 36-year sentence does not establish that the court abused its discretion. Surely a court does not cede its sentencing authority or discretion to an expert just because it may agree with the expert in certain respects.

¶ 31      Defendant also claims that his sentence is excessive because the trial court did not give proper weight to the factors set forth in *Miller* and in section 5-4.5-105 of the Code. Defendant points to his age, difficult upbringing, mental health issues, and "peer pressure" as mitigating factors that contributed to his decision to shoot and kill the victim. Defendant argues that Dr. Garbarino gave "unrebutted testimony" that these factors favored the imposition of a lenient sentence.

¶ 32      All the mitigating evidence defendant points to was presented at the sentencing hearing. This includes the testimony of the witnesses, the PSI, and defendant's statement in allocution. We presume that the trial court considered all relevant factors, including any mitigating evidence, absent some explicit indication to the contrary. See *People v. Halerewicz*, 2013 IL App (4th) 120388, ¶ 43. Moreover, "the trial court is not required to expressly indicate its consideration of all mitigating factors and what weight each factor should be assigned." *Id.* Although not required to do so, the trial court made detailed comments in this case that make clear that it considered all the evidence defendant now claims was ignored. The court specifically stated that, before determining an appropriate sentence, it considered the PSI, the testimony of the witnesses, defendant's allocution statement, the statutory factors in aggravation and mitigation, defendant's history and character, and the relevant *Miller* factors. After reciting the evidence considered, but before announcing the sentence, the court even noted that it was not going to make "particular

findings point by point." Indeed, a trial court is not required to recite and assign a value to each factor it considered, nor is it required to detail for the record the precise process by which it determined the appropriate sentence. *Id.*; *People v. McGuire*, 2017 IL App (4th) 150695, ¶ 38. While there was certainly mitigating evidence presented at sentencing, the trial court is not required to give that evidence greater weight than the seriousness of the offense or the factors in aggravation. *Alexander*, 239 Ill. 2d at 214; *Halerewicz*, 2013 IL App (4th) 120388, ¶ 42. Finally, the fact that Dr. Garbarino's testimony was unrebutted by another expert is of no consequence, as the court was still free to disregard as much or as little of the doctor's testimony as it saw fit. See *Tara*, 367 Ill. App. 3d at 489 ("[T]he trial court need not accept the opinion of one expert even where that expert's testimony is not directly countered by the expert testimony of another.").

¶ 33            Defendant also takes issue with the trial court "coming back to one circumstance of the offense—the death of Robreco King." Defendant acknowledges that this statement was "legally correct," but he claims that the court "could not legally allow that factor to outweigh all of the circumstances surrounding the offense." As defendant acknowledges, while a trial court may not consider a factor inherent in the offense as an aggravating factor, a court may consider the nature and circumstances of the offense, including the nature and extent of each element of the offense, as aggravating factors. *People v. James*, 255 Ill. App. 3d 516, 532 (1993). When the record from the sentencing hearing is considered as a whole, it is evident that this is what the trial court considered and that it did not consider a factor inherent in the offense as an aggravating factor. See *People v. Fort*, 229 Ill. App. 3d 336, 340 (1992) ("In determining the correctness of a sentence, the reviewing court should not focus on a few words or statements made by the trial court, but it is to consider the record as a whole.").

¶ 34 Ultimately, the record shows that the trial court considered the mitigating evidence and the relevant sentencing factors. The court exercised its discretion and weighed that evidence against the other evidence presented at the hearing and imposed a 36-year sentence. Defendant points to nothing in the record except for the sentence he received as evidence that the court did not consider the mitigating factors. On the record before us, we cannot conclude that the sentence imposed was an abuse of discretion.

¶ 35                                       III. CONCLUSION

¶ 36 For the reasons stated, we affirm the trial court's judgment.

¶ 37 Affirmed.