2026 IL App (1st) 241030-U

No. 1-24-1030

Third Division
June 3, 2026

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST DISTRICT

_____

|  |  |  |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the Circuit Court |
|  | ) | of Cook County. |
| Plaintiff-Appellee, | ) |  |
|  | ) | No. 14 CR 1175301 |
| v. | ) |  |
|  | ) | The Honorable |
| ESSIE NOONER, | ) | Patrick K. Coughlin, |
|  | ) | Judge Presiding. |
| Defendant-Appellant. | ) |  |
|  | ) |  |

_____

JUSTICE REYES delivered the judgment of the court.
Presiding Justice Martin and Justice Lampkin concurred in the judgment.

**ORDER**

¶ 1    *Held:* The circuit court's judgment is affirmed, where (1) the instant appeal does not present the appropriate avenue for defendant to raise his claims concerning the effectiveness of his first appellate counsel and (2) the circuit court's sentence was not unconstitutional or excessive.

¶ 2    After a jury trial, defendant Essie Nooner was found guilty of first degree murder (720 ILCS 5/9-1(a)(1) (West 2014)) and attempted first degree murder (*id.*; *id.* § 8-4) under an accountability theory, and was sentenced to a total of 66 years in the Illinois Department of Corrections (IDOC). Defendant appealed, challenging only his sentence, and we reversed and

remanded for resentencing after finding that the trial court's sentence was based on a misunderstanding of the evidence. See *People v. Nooner*, 2021 IL App (1st) 190334-U. After a new sentencing hearing, defendant was sentenced to a total of 56 years in the IDOC. Defendant now appeals, contending (1) that his initial appellate counsel was ineffective in failing to challenge the sufficiency of the evidence in his first appeal and (2) that his sentence is excessive and violates the proportionate penalties clause of the Illinois Constitution. For the reasons set forth below, we affirm.

¶ 3                                    BACKGROUND

¶ 4       As this appeal represents the second time defendant's case has been before this court, we take our recitation of facts from our prior decision where appropriate.

¶ 5                                       *Trial*

¶ 6       Defendant, along with codefendants Kendall Roberson and William Gillyard, was charged by indictment with the first degree murder of John McIntyre and the attempted first degree murder of Najee Kellum; defendant's charges were based on an accountability theory. Defendant and Roberson were tried simultaneously before separate juries, while Gillyard was separately tried. The State's evidence at defendant's trial established that on June 6, 2014, Roberson called McIntyre (on speakerphone with defendant and Roberson's brother Durrell present) and asked if he wanted to purchase two televisions. After McIntyre agreed, Roberson instructed him to meet him at Roberson's home in Sauk Village. McIntyre then drove with Kellum to Roberson's residence; McIntyre had been to the home approximately four to five times in the past to purchase merchandise.

¶ 7       When McIntyre arrived, defendant, Roberson, and Gillyard entered the back seat of McIntyre's vehicle; Kellum was sitting in the front passenger's seat. Defendant directed

McIntyre to an abandoned house nearby where the televisions were located. As McIntyre pulled into the driveway of the abandoned house, Gillyard shot McIntyre in the back of the head and shot Kellum twice, striking her once in the side of the face and once in the wrist. Kellum ran from the vehicle and defendant, Roberson, and Gillyard similarly dispersed. None of McIntyre's or Kellum's property was taken from the vehicle before the occupants dispersed. McIntyre was pronounced dead at the hospital a short time later. Kellum identified defendant as one of the offenders in a photo array and later testified that they had attended school together for several years.

¶ 8     Defendant turned himself in at the police station the morning after the shooting and, after waiving his *Miranda* rights, defendant was interviewed by detectives. During his interview, defendant admitted that he, Gillyard, and Roberson had planned to rob McIntyre. Defendant further admitted that he knew Gillyard intended to murder McIntyre. Defendant, however, denied that he intended to murder McIntyre and appeared visibly disturbed over McIntyre's death.

¶ 9     As part of its case in chief, the State presented the testimony of Tamara Ivy (defendant's girlfriend at the time), Iesha Stewart (Roberson's girlfriend at the time), Marcus Stokes, and Roberson's brother Durrell. In interviews with police and before the grand jury, these witnesses indicated that they were present at Roberson's home on the date at issue and that they had heard information which implicated defendant. Specifically, Ivy informed police that, while in her presence, Gillyard told defendant and Roberson that he was going to shoot McIntyre in the back of the head, then rob him of his money and drugs; she also informed police that she observed a firearm in Gillyard's pocket. Stokes informed police that he heard a conversation between Gillyard and defendant in which they discussed robbing McIntyre; as part of this

conversation, Gillyard stated that he was going to shoot McIntyre in the head and defendant stated that if there were any witnesses, the witnesses would be killed. Stewart told police that, while in a group with her, Ivy, defendant, and Roberson, Gillyard stated that he was going to shoot McIntyre in the back of the head and take drugs and money from him. Finally, Durrell informed police that McIntyre was known for having a lot of money and that, when defendant and Roberson were discussing selling televisions to him, Gillyard indicated that he was going to rob McIntyre of his money and drugs; Durrell also observed Gillyard with a firearm. At trial, however, each of these witnesses disavowed their prior statements, testifying that they did not recall making them and did not recall the details of the date at issue. As a result, their videotaped statements to police were played for the jury and their testimonies from the grand jury proceedings were read to the jury.

¶ 10    After the State rested its case, defendant presented no evidence, and the jury ultimately found defendant guilty of first degree murder and attempted murder. Prior to returning its verdict, the jury sent a note to the trial court which read: " 'We would like to know if we could consider a lesser charge of [*sic*] first degree murder?' " The trial court informed the jury that it could not, and the jury returned its verdict approximately half an hour later.

¶ 11                    *Original Sentence and Initial Appeal*

¶ 12    The matter proceeded to sentencing and the trial court ordered a presentence investigation report (PSI). The PSI indicated that defendant was one of four siblings raised by his parents until the age of seven, when his mother, a victim of domestic violence, killed his father in self-defense during a dispute. Thereafter, defendant resided with his grandparents until the age of nine. From the ages of 9 to 13, he resided with his mother, then returned to live with his grandparents at age 13. Defendant reported that while he now has a "good" relationship with

his mother, that relationship had been contentious in the past. Defendant was upset with his mother for killing his father, and described his childhood as "bad" due to his father's death. Defendant, however, stated that he was never abused or neglected as a child. He also denied any family history of alcohol or substance abuse, but admitted he used marijuana on a daily basis from ages 12 to 18. Defendant, who was 22 at the time the PSI was prepared, stated that he was the biological father of an eight-year-old daughter. He also related that he had no employment history.

¶ 13    Regarding his educational background, defendant attended high school from 2009 to 2012 but did not graduate, as he was expelled from school for fighting. While in school, defendant was placed in special education programs for behavioral and learning disorders. Defendant denied membership in a street gang, but admitted he was friends with 10 individuals who are members of a street gang. Defendant had no prior criminal history.

¶ 14    After considering the evidence and the parties' arguments, the trial court sentenced defendant to 30 years in the IDOC for the murder count plus a mandatory 15-year firearm enhancement, for a total of 45 years, to be served at 100% time. Defendant was also sentenced to the minimum 6 years' imprisonment for the attempted murder count plus a mandatory 15-year firearm enhancement, for a total of 21 years, to be served at 85% time, which was to be served consecutively to the murder sentence.

¶ 15    Defendant filed an appeal, challenging only his sentence. On appeal, we found that the trial court misapprehended the evidence where it inaccurately stated on several occasions that defendant, not Roberson, was the individual who had called McIntyre about purchasing the televisions. See *Nooner*, 2021 IL App (1st) 190334-U, ¶ 24. In addition, we found that the evidence introduced in the sentencing hearing was closely balanced such that the trial court's

misunderstanding may have impacted defendant's sentence. *Id.* ¶ 29. Accordingly, we reversed defendant's sentence and remanded for a new sentencing hearing. *Id.*

¶ 16                                                          *Resentencing*

¶ 17        On remand, the matter was assigned to a different judge[1] for the resentencing hearing, and a new PSI was prepared. In the updated PSI, defendant reported witnessing his father's death. Defendant also reported having a "rocky" relationship with his mother growing up due to her alcohol use and physical abuse, but reported that it had improved over time. Defendant indicated that he had one daughter, who was 12 years old at the time of the PSI, and an 11-year-old son. Defendant also reported being "affiliated" with the Black Disciples street gang since age 13.

¶ 18        In addition, defendant submitted a sentencing memorandum focused on his psychological immaturity at the time of the offense, his limited degree of participation in the offense, his rehabilitative potential, and his extreme remorse, contending that, together, these factors warranted treating him as a juvenile for purposes of sentencing. Defendant included an expert report prepared by developmental psychologist Dr. James Garbarino, who met with defendant for several hours in the course of compiling his report. Dr. Garbarino opined that defendant, who was 18 years old at the time of the offense, "was best understood as an untreated traumatized child." Dr. Garbarino pointed to the fact that defendant witnessed drug use and domestic violence in the home, culminating in his mother killing his father. Dr. Garbarino also described defendant's childhood as characterized by emotional abuse and neglect.

---

[1] The original judge presiding over defendant's case passed away shortly after defendant was originally sentenced.

¶ 19  Dr. Garbarino applied the "Adverse Childhood Experiences" assessment to defendant, which provides an objective mechanism for comparing the negative childhood influences in a particular individual's life with those of the general population. Defendant's score was a 9 out of 10, which was worse than 999 out of 1,000 Americans. Dr. Garbarino opined that defendant's family and home environment was developmentally damaging, leading defendant to be, essentially, a "child inhabiting and controlling the body of a teenager."

¶ 20  Prior to defendant's new sentencing hearing, defendant also filed a motion for new trial, claiming that he was deprived of a fair trial where (1) the trial court denied his motion to suppress his statement, (2) the trial court admitted the statements of his co-conspirators, (3) the trial court denied his motion for a directed verdict, and (4) the trial court denied his previous posttrial motions. Defendant also claimed that he was entitled to a new trial where he received ineffective assistance of trial counsel.

¶ 21  Defendant's sentencing hearing was held on March 21, 2024. Prior to beginning the sentencing hearing, the circuit court dismissed defendant's motion for new trial, as the matter had been remanded only for resentencing and the circuit court found it lacked jurisdiction to address any other issues. At the sentencing hearing, the State presented the victim impact statements of McIntyre's parents and Kellum in aggravation. In mitigation, defendant presented the testimony of his mother and of Dr. Garbarino, who testified consistently with his report.

¶ 22  After considering the testimony and the parties' arguments, the circuit court found that there was "no question" that Dr. Garbarino was an expert in the area of childhood development, but noted that he had spoken with defendant for only a few hours and did not do any independent verification of defendant's statements during that interview. The circuit court also

7

found that there were "major contradictions" between defendant's original PSI and the updated PSI concerning defendant's reported substance and alcohol use, his gang involvement, and his relationship with his family. The circuit court also observed that both PSIs indicated that defendant had received mental health treatment, so contrary to Dr. Garbarino's report, the court "can't say that he was completely untreated for any trauma from his father's murder."

¶ 23    The circuit court further noted that several of the inconsistent answers were used by Dr. Garbarino in applying the "Adverse Childhood Experiences" assessment, resulting in a higher score. The circuit court also found that, despite the conclusions of the report, defendant did not actually witness his mother killing his father and witnessed only two to three acts of domestic violence prior to his father's death, after which there was no evidence of domestic violence of any kind either inflicted or witnessed. The circuit court took issue with Dr. Garbarino's characterization of defendant's environment as an " 'urban war zone' " and a " 'socially toxic environment,' " noting that "anyone who's practiced for some length of time in felony courts have seen individuals when, even on paper, you can tell the deck was stacked against them" and that defendant was not one such individual. Accordingly, the circuit court found that defendant was not required to be treated as a juvenile for sentencing purposes.

¶ 24    The circuit court, however, nevertheless determined that defendant should receive the minimum sentence under the law. Consequently, the circuit court sentenced defendant to consecutive sentences of 35 years for the murder, to be served at 100%, and 21 years for the attempted murder, to be served at 85%, for a total of 56 years, followed by three years of mandatory supervised release.

¶ 25    Defendant filed a motion to reconsider sentence, which was denied, and this appeal follows.

¶ 26                                    ANALYSIS

¶ 27        On appeal, defendant contends (1) that his initial appellate counsel was ineffective in failing to challenge the sufficiency of the evidence in his first appeal and (2) that his sentence is excessive and violates the proportionate penalties clause of the Illinois Constitution. We consider each argument in turn.

¶ 28                        *Ineffective Assistance of Appellate Counsel*

¶ 29        Defendant first claims that his original appellate counsel was ineffective for raising only sentencing issues on appeal and failing to challenge the sufficiency of the evidence. A criminal defendant is guaranteed the effective assistance of appellate counsel. *People v. Mack*, 167 Ill. 2d 525, 531 (1995). Claims of ineffective assistance of appellate counsel are measured using the same standards as those applying to claims of ineffective assistance of trial counsel. *People v. Childress*, 191 Ill. 2d 168, 175 (2000). Specifically, a defendant who contends that appellate counsel was ineffective must establish that the failure to raise an issue on direct appeal was objectively unreasonable and that the decision prejudiced the defendant. *Id.* Appellate counsel is not required to raise every conceivable issue on appeal, and "it is not incompetence of counsel to refrain from raising issues which, in his or her judgment, are without merit, unless counsel's appraisal of the merits is patently wrong." *People v. West*, 187 Ill. 2d 418, 435 (1999) (citing *People v. Collins*, 153 Ill. 2d 130, 140 (1992)). Accordingly, unless the underlying claim is meritorious, a defendant cannot be said to have suffered prejudice from counsel's failure to raise it on appeal. *Id.*

¶ 30        Defendant's challenge in the instant case is somewhat unusual, as it occurs in an atypical procedural posture. Claims of ineffective assistance of appellate counsel most often occur in the context of postconviction proceedings. See *Mack*, 167 Ill. 2d at 531 (a claim of ineffective

assistance of appellate counsel is permitted in postconviction proceedings). This case, however, is not a postconviction action. Instead, this is a second direct appeal, arising from our reversal of the trial court's sentence and remand for resentencing. As such, we must determine whether defendant may raise such a claim at this point in the proceedings.

¶ 31    We first observe that, not only does defendant raise this claim in the context of a second direct appeal, he does so without having first raised it in the circuit court. While defendant filed a motion for new trial in connection with the resentencing hearing, he raised the issue of ineffective assistance of *trial* counsel, not appellate counsel, and none of his claims concerned the sufficiency of the evidence. In addition, when a reviewing court issues a mandate, it vests the trial court with jurisdiction only to take action which conforms with that mandate. *People ex rel. Daley v. Schreier*, 92 Ill. 2d 271, 276 (1982); *People v. Abraham*, 324 Ill. App. 3d 26, 30 (2001). Here, our prior decision remanded for a new sentencing hearing, so the circuit court had jurisdiction only to conduct such a hearing. Accordingly, despite defendant's contention to the contrary, the circuit court in this case correctly found that it had no jurisdiction to consider defendant's motion for new trial.

¶ 32    We also observe that, "[w]hen an appellate court reverses and remands the cause with a specific mandate, the only proper issue on a second appeal is whether the trial court's order is in accord with the mandate." *Petre v. Kucich*, 356 Ill. App. 3d 57, 63 (2005) (citing *Foster v. Kanuri*, 288 Ill. App. 3d 796, 799 (1997)). Our supreme court has indicated that "[i]t is axiomatic that in an appeal from a contested proceeding, the only errors at issue are those errors which occurred at that proceeding." *People v. Hall*, 195 Ill. 2d 1, 34 (2000). Thus, where a matter is remanded for a new sentencing hearing, an appeal from that sentencing hearing is not the proper vehicle in which to raise an argument concerning the original trial. See *id.*; see also

*People v. Robinson*, 2021 IL App (1st) 192289, ¶ 35; *People v. Johnson*, 352 Ill. App. 3d 442, 448 (2004). In this case, then, an appeal from defendant's resentencing is not the proper vehicle for defendant to raise a claim concerning the sufficiency of the evidence at the earlier trial, even when couched as an ineffective assistance of appellate counsel claim. Defendant cites no case, nor have we discovered one in our independent research, in which such a claim has been considered in similar circumstances.

¶ 33    We cannot agree with defendant's position that *People v. Veach*, 2017 IL 120649, requires a different result. In that case, our supreme court indicated that a defendant is required to bring an ineffective assistance of counsel claim on direct appeal where the record is sufficient for review of such a claim. *Id.* ¶ 47. Defendant claims that, here, where the record is sufficient to review his claims of ineffective assistance of appellate counsel, *Veach* requires him to raise the claim at this point in the proceedings. We disagree. *Veach* discussed ineffective assistance of *trial* counsel claims which could be raised on direct appeal. See *id. Veach* said nothing about ineffective assistance of *appellate* counsel claims, as that was not the issue before the supreme court, and certainly did not address the propriety of raising such a claim on appeal after a limited remand, as in the instant case. Consequently, we agree with the State that the instant appeal is not the proper vehicle for defendant's ineffective assistance of appellate counsel claim and decline to address the merits of his claim. Instead, defendant's challenge to the effectiveness of his appellate counsel is more properly raised in a postconviction petition, which is the typical venue for such claims, and nothing in our decision today should be interpreted to prevent defendant from raising his claims in that form.

¶ 34                                            *Sentencing*

¶ 35        Defendant also contends that the circuit court erred in resentencing him to a total of 56 years in the IDOC. As noted, defendant was convicted of first degree murder and attempted first degree murder. The sentencing range for first degree murder is 20 to 60 years (730 ILCS 5/5-4.5-20(a) (West 2024)), while the sentencing range for attempted first degree murder is 6 to 20 years (*id.* § 5-4.5-25). In addition, both offenses carry a mandatory 15-year sentencing enhancement where the offense was committed while armed with a firearm, which applies even where the conviction is based on an accountability theory. See *id.* § 5-8-1(d)(i) (first degree murder); 720 ILCS 5/8-4(c)(1)(B) (West 2024) (attempted first degree murder); *People v. Rodriguez*, 229 Ill. 2d 285, 294 (2008) (discussing enhancement applicable to first degree murder based on accountability). Where, as here, there was a finding of severe bodily injury, the sentences are required to run consecutively. See 730 ILCS 5/5-8-4(d)(1) (West 2024). In this case, the circuit court indicated that it was imposing the minimum sentence for each offense, which it determined was 35 years for first degree murder and 21 years for attempted first degree murder, for a total sentence of 56 years. On appeal, defendant contends that the circuit court's sentence was unconstitutional or, at a minimum, was excessive in light of defendant's youth.[2]

¶ 36        Defendant's arguments are based on two theories. He first argues that his sentence violates the proportionate penalties clause of the Illinois Constitution (Ill. Const. 1970, art. I, § 11). Alternatively, defendant claims that his sentence, even if not unconstitutional, nevertheless

---

[2] Defendant on appeal does not specify the sentence he believes should have been imposed, although at oral argument, counsel suggested that the time he has served would be appropriate. At the resentencing hearing, however, defense counsel asked for the minimum sentences of 20 years for the murder and 6 years for the attempted murder (*i.e.*, without the sentencing enhancements), to be served concurrently.

represented an abuse of the circuit court's discretion. While defendant treats these contentions separately, we observe that they are inextricably intertwined. As noted, the circuit court in this case sentenced defendant to the minimum sentence for adult offenders. This is, on its face, appropriate, as defendant was over the age of 18 at the time and therefore was an adult offender for purposes of the crimes for which he was convicted. In his second argument, however, defendant argues that he should have been *treated as* a juvenile for sentencing purposes and that the circuit court's declining to do so constituted an abuse of discretion. While a circuit court has broad discretion in sentencing (see *People v. Alexander*, 239 Ill. 2d 205, 212 (2010)), it generally may not impose a sentence which does not comply with statutory guidelines (see, *e.g.*, *People v. White*, 2011 IL 109616, ¶ 20). The only authority cited by defendant which would permit a circuit court to sentence a defendant below a statutory minimum sentence— and would specifically allow such sentencing based on the defendant's maturity and development—is where the imposition of the minimum sentence violates the proportionate penalties clause. See *People v. Miller*, 202 Ill. 2d 328, 338 (2002) (*Leon Miller*); see also *People v. Merchant*, 2026 IL App (5th) 230571-U, ¶ 125 ("The proportionate penalties clause of the Illinois constitution allows courts to deviate from the statutory minimum sentence in certain situations."). Thus, both of defendant's arguments are fundamentally based on the proportionate penalties clause. In other words, if the circuit court was not *permitted* to sentence defendant below the statutory minimum, then its decision to impose the minimum 56-year adult sentence cannot have been excessive. We turn, then, to an examination of whether defendant's sentence violated the proportionate penalties clause.

¶ 37    A sentence which is within the applicable statutory limits is presumed to be proper. *People v. Webster*, 2023 IL 128428, ¶ 21. As such, a circuit court's sentence will not be altered on

review unless "the sentence is greatly at variance with the spirit and purpose of the law, or manifestly disproportionate to the nature of the offense." *People v. Stacey*, 193 Ill. 2d 203, 210 (2000). The proportionate penalties clause of the Illinois Constitution provides that "[a]ll penalties shall be determined both according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship." Ill. Const. 1970, art. I, § 11.

¶ 38    As relevant to the instant case, our supreme court has explained that a statute violates the proportionate penalties clause where "the punishment for the offense is cruel, degrading, or so wholly disproportionate to the offense as to shock the moral sense of the community." (Internal quotation marks omitted.) *People v. Hilliard*, 2023 IL 128186, ¶ 20. In determining whether a statute shocks the moral sense of the community, "[a] court reviews the gravity of the defendant's offense in connection with the severity of the statutorily mandated sentence within our community's evolving standard of decency." (Internal quotation marks omitted.) *Id.*

¶ 39    As an initial matter, we observe that, since defendant's resentencing hearing occurred in 2024, he will be eligible for parole after serving 20 years of his sentence. See 730 ILCS 5/5-4.5-115(b) (West 2024). As such, despite defendant's contention to the contrary, he is not subject to a *de facto* life sentence as the applicable sentencing scheme affords him a meaningful opportunity for release before serving 40 years in prison. *People v. Spencer*, 2025 IL 130015, ¶ 40. A defendant, however, is not required to be sentenced to a life sentence in order to raise a proportionate penalties clause challenge, and a defendant may challenge a sentence of any length. *Id.* ¶ 43.

¶ 40    A proportionate penalties clause challenge may be either a facial or an as-applied challenge. *Hilliard*, 2023 IL 128186, ¶ 21. In a facial challenge, the question is whether the statute is unconstitutional under any set of facts, while an as-applied challenge is dependent on

the particular facts and circumstances of the challenging party. *Id.* Defendant's challenge in the instant case is an as-applied challenge, as his claims depend on his particular facts and circumstances. "A defendant bringing an as-applied challenge to a mandatory sentencing statute must ultimately overcome the presumption that the statute is constitutional by clearly establishing that the statute is invalid as applied to him." *Id.* (citing *People v. House*, 2021 IL 125124, ¶ 18).

¶ 41    Since an as-applied challenge is fact-specific, "it is paramount that the record be sufficiently developed in terms of those facts and circumstances for purposes of appellate review." (Internal quotation marks omitted.) *People v. Harris*, 2018 IL 121932, ¶ 39. Indeed, our supreme court has cautioned that "[a] court is not capable of making an 'as applied' determination of unconstitutionality when there has been no evidentiary hearing and no findings of fact." (Internal quotation marks omitted.) *Id.*

¶ 42    In this case, defendant's constitutional argument was squarely presented to the circuit court during the resentencing hearing, as it represented the basis for defendant's arguments concerning his sentence. Specifically, defendant contended that his youth and upbringing, along with his limited involvement in the crime, required him to be treated as a juvenile for sentencing purposes. In support of his argument, defendant presented the report and live testimony of an expert witness, Dr. Garbarino. Thus, there was an evidentiary hearing concerning defendant's constitutional challenge, and the circuit court made findings of fact in connection with imposing defendant's sentence. Accordingly, defendant's as-applied challenge is properly before us and the record on appeal contains a fully developed factual record on the issue.

¶ 43 Whether a statute violates the proportionate penalties clause as applied to a particular defendant is a question of law which we review *de novo*. *Spencer*, 2025 IL 130015, ¶ 25. The circuit court, however, is in the best position to determine the credibility of witnesses, resolve conflicts in their testimony and, ultimately, to determine the appropriate weight to give such testimony. See *People v. Richardson*, 234 Ill. 2d 233, 251 (2009). As such, a circuit court's findings of fact during a sentencing hearing will not be reversed unless they are against the manifest weight of the evidence. *People v. Mauricio*, 2021 IL App (2d) 190619, ¶ 29. See *People ex rel. Hartrich v. 2010 Harley-Davidson*, 2018 IL 121636, ¶ 13 (while an as-applied constitutional challenge is reviewed *de novo*, "[w]e will, of course, continue to give deference to the trial court's underlying credibility and factual findings, reversing them only if they are against the manifest weight of the evidence").

¶ 44 In this case, as noted, defendant raises two challenges to his sentence. First, defendant contends that, based on his limited culpability and potential for rehabilitation, his sentence is unconstitutional. Second, defendant contends that Dr. Garbarino's report and subsequent testimony established that defendant should be treated as a juvenile for sentencing purposes. As both of defendant's arguments involve a consideration of the circuit court's treatment of Dr. Garbarino's opinions, we begin with defendant's argument concerning his development and maturity.

¶ 45 "The weight accorded an expert's opinion must be measured by the facts supporting the opinion and the reasons given for his or her conclusions." *Doser v. Savage Manufacturing & Sales, Inc.*, 142 Ill. 2d 176, 195 (1990); *People v. Jones*, 2017 IL App (1st) 143403, ¶ 27; *People v. Tara*, 367 Ill. App. 3d 479, 489 (2006). The circuit court is permitted to accept or reject an expert's testimony in whole or in part, and "the [circuit] court need not accept the

opinion of one expert even where that expert's testimony is not directly countered by the expert testimony of another." *Tara*, 367 Ill. App. 3d at 489 (citing *Villareal v. Peebles*, 299 Ill. App. 3d 556, 562 (1998)). Indeed, "[e]ven where the experts are 'eminently qualified,' the [circuit] court need not take their opinions as conclusive on the matter." *John Crane Inc. v. Allianz Underwriters Insurance Co.*, 2020 IL App (1st) 180223, ¶ 20. A factfinder cannot, however, arbitrarily or capriciously reject unimpeached testimony. *Bazydlo v. Volant*, 164 Ill. 2d 207, 215 (1995).

¶ 46    Here, while the circuit court found that there was "no question" that Dr. Garbarino was an expert in the area of childhood development, it nevertheless found that there were serious issues with his analysis and ultimately did not adopt Dr. Garbarino's opinion that defendant was developmentally a juvenile. Specifically, the circuit court pointed to the length of time Dr. Garbarino spent with defendant, as well as the lack of independent verification of defendant's claims. The latter was of particular concern to the circuit court, as defendant's representations to Dr. Garbarino served as the foundation for the "Adverse Childhood Experiences" assessment and the circuit court found inconsistencies between defendant's representations and his prior PSI. Consequently, the circuit court declined to find that defendant was functionally a juvenile for sentencing purposes. We cannot find that it was against the manifest weight of the evidence for the circuit court to decline to adopt Dr. Garbarino's opinion.

¶ 47    First, we observe—as the circuit court did—that Dr. Garbarino's report stated that he was not offering any clinical diagnosis of defendant but was "serving as an educational witness." In addition, the circuit court's concern over the lack of independent verification of defendant's representations was certainly not unwarranted, as defendant's veracity during his conversation with Dr. Garbarino would have directly affected the score he received on the "Adverse

Childhood Experiences" assessment. Indeed, we have previously affirmed a circuit court's discretion to discount his opinion in part for that very reason. See, *e.g.*, *People v. Masters*, 2024 IL App (4th) 230370, ¶¶ 85-88; *People v. Croom*, 2022 IL App (4th) 210410-U, ¶ 65. Moreover, in this case, the comparison between defendant's earlier and later PSIs revealed certain inconsistencies, which the circuit court characterized as "major contradictions." While defendant downplays their importance, it was for the circuit court—not this court—to determine the weight to be placed on these inconsistencies, and we will not reweigh the circuit court's assessment. We further observe that the circuit court thoroughly explained what it believed were contradictions between the PSIs and, more importantly, why it believed these contradictions were important, discussing how each would have affected defendant's scoring on the assessment. The record amply demonstrates the circuit court's careful consideration of Dr. Garbarino's report and testimony prior to its finding that defendant was not developmentally a juvenile for purposes of sentencing. We cannot find that this conclusion was against the manifest weight of the evidence. Accordingly, where defendant's particular facts and circumstances did not render him akin to a juvenile, we cannot find that the imposition of the minimum adult sentence was excessive or resulted in a violation of the proportionate penalties clause.

¶ 48    We similarly cannot find that the sentence violated the proportionate penalties clause when comparing the seriousness of the offense to defendant's rehabilitative potential. As noted, a statute violates the proportionate penalties clause where "the punishment for the offense is cruel, degrading, or so wholly disproportionate to the offense as to shock the moral sense of the community." (Internal quotation marks omitted.) *Hilliard*, 2023 IL 128186, ¶ 20. In determining whether a statute shocks the moral sense of the community, "[a] court reviews the

gravity of the defendant's offense in connection with the severity of the statutorily mandated sentence within our community's evolving standard of decency." (Internal quotation marks omitted.) *Id*. Importantly, however, the possibility of rehabilitation is not required to be given greater weight and consideration than the seriousness of the offense in determining a proper penalty. *Id.* ¶ 40.

¶ 49    In this case, defendant contends that his limited involvement in the case, coupled with his young age and traumatic background, demonstrates that his 56-year sentence shocks the moral sense of the community. We observe that our supreme court has found that the mandatory firearm enhancements for both first degree murder and attempted first degree murder, in and of themselves, do not shock the moral sense of the community. See *People v. Sharpe*, 216 Ill. 2d 481, 524 (2005) (discussing enhancement for first degree murder); *People v. Morgan*, 203 Ill. 2d 470, 488 (2003), *overruled on other grounds by Sharpe*, 216 Ill. 2d 481 (discussing enhancement for attempted first degree murder). We further observe that, while the legislature has determined that the firearm enhancement is discretionary as to individuals who were juveniles at the time they committed their crimes, it "made a deliberate choice not to extend this discretion to sentences for individuals who were adults at the time of their offenses." *Hilliard*, 2023 IL 128186, ¶ 38. As our supreme court has noted, "[t]he legislature's determination of a particular punishment for a crime in and of itself is an expression of the general moral ideas of the people." *Id.* (citing *People v. Coty*, 2020 IL 123972, ¶ 43). As such, our supreme court has found that it does not violate the proportionate penalties clause to impose a mandatory sentencing enhancement for an 18-year-old defendant—even accepting that his brain had not yet fully developed—based on the seriousness of the offense. *Id.* ¶ 40.

¶ 50    Here, defendant was convicted of two extremely serious offenses—the murder of McIntyre and the attempted murder of Kellum. While his convictions were based on an accountability theory, that does not suggest that the imposition of a firearm enhancement based on Gillyard's use of a firearm shocks the moral sense of the community, especially where there was evidence presented at trial which suggested that defendant was aware that Gillyard possessed the firearm prior to meeting with McIntyre. Instead, the crux of defendant's argument concerns his contention that the circuit court was required to credit Dr. Garbarino's opinion and find that defendant's development was akin to that of a juvenile. As we have explained, however, the circuit court's finding that defendant was not developmentally a juvenile was not against the manifest weight of the evidence. Thus, the imposition of the firearm enhancements in defendant's case does not violate the proportionate penalties clause.

¶ 51    To the extent that defendant argues on appeal that the proportionate penalties clause requires a sentence even lower than the 20-year minimum sentence for first degree murder, we disagree. While there is no dispute that defendant was not the shooter—and while defendant may not have personally intended for McIntyre to die—there was evidence presented at trial establishing defendant's involvement in the death of McIntyre and the shooting of Kellum by virtue of accountability. As noted, there was also evidence presented suggesting his awareness of Gillyard's firearm and of Gillyard's plan to rob McIntyre at gunpoint—there was even evidence that defendant heard Gillyard state that he was going to shoot McIntyre in the head. Defendant nevertheless chose to continue his involvement and to enter McIntyre's vehicle with Gillyard and Roberson, despite the fact that he had a longstanding, seemingly close relationship with McIntyre.

¶ 52     We also observe that, even if defendant has a potential for rehabilitation, that does not mean that the imposition of the minimum adult sentence in this case violates the proportionate penalties clause. As noted, the possibility of rehabilitation is not required to be given greater weight and consideration than the seriousness of the offense in determining a proper penalty. *Hilliard*, 2023 IL 128186, ¶ 40.

¶ 53     Moreover, as noted above, defendant will have the opportunity to seek parole after serving 20 years of his sentence, meaning that it is possible that he will be released after serving only the minimum sentence for first degree murder. See 730 ILCS 5/5-4.5-115(b) (West 2024). While we, of course, have no way of knowing whether defendant will receive such parole, we observe that the very availability of parole is something which will not be afforded to Roberson, the codefendant who defendant claims received a more favorable sentence. See *id.* (statute applies to defendants who were sentenced "on or after June 1, 2019"); *People v. Roberson*, 2021 IL App (1st) 181726-U (affirming Roberson's 40-year sentence).[3]

¶ 54     As earlier explained, we can find no error in the circuit court's determination that the particular facts and circumstances of defendant's life did not render him a juvenile for sentencing purposes. Accordingly, given the seriousness of the offenses at issue, we cannot find that sentencing defendant as an adult—*i.e.*, imposing mandatory firearm enhancements and consecutive sentences—violated the proportionate penalties clause.

¶ 55     Unless the circuit court has abused its discretion in imposing a sentence, this court may not reduce the sentence on appeal. *People v. Webster*, 2023 IL 128428, ¶ 32; *People v. Perruquet*,

---

[3] While not dispositive in this case, we observe that we affirmed Roberson's sentence after rejecting a proportionate penalties clause challenge based on his rehabilitative potential. See *Roberson*, 2021 IL App (1st) 181726-U, ¶¶ 28-33.

21

68 Ill. 2d 149, 153-54 (1977). Consequently, we decline defendant's request to reduce his sentence.

¶ 56                                    CONCLUSION

¶ 57       The circuit court's judgment is affirmed, where (1) the instant appeal does not present the appropriate avenue for defendant to raise his claims concerning the effectiveness of his first appellate counsel and (2) the circuit court's sentence was not unconstitutional or excessive.

¶ 58       Affirmed.